*Attorney Grievance Commission of Maryland v. Gayton Joseph Thomas, Jr.*, No. 63, September Term, 2013

**ATTORNEY MISCONDUCT—DISCIPLINE—DISBARMENT**—Court of Appeals disbarred attorney who gave incorrect advice to a client in an immigration matter, told the client that he did not need to appear at an immigration hearing and then did not appear himself (with the result the client was ordered *in absentia* removed from the United States), accepted payment from the client, and then stopped responding to all inquiries from the client as to the status of the case. Respondent also did not respond to lawful inquiries from Bar Counsel for information concerning the complaint. Such conduct violated Maryland Lawyers' Rules of Professional Conduct 1.1, 1.3, 1.4, 8.1, and 8.4(c) and (d).

Circuit Court for Baltimore County

Case No. 03-C-13-13179
Argued: 7 October 2014

IN THE COURT OF APPEALS OF
MARYLAND

Misc. Docket AG No. 63

September Term, 2013

ATTORNEY GRIEVANCE
COMMISSION OF MARYLAND

v.

GAYTON JOSEPH THOMAS, JR.

Barbera, C.J.,
Harrell,
Battaglia,
Greene,
Adkins,
McDonald,
Watts,

JJ.

Opinion by Harrell, J.
McDonald, J., concurs.

Filed:  November 20, 2014

## I. The Story of the Straight-Forward Made Complicated

In this attorney disciplinary action, the Attorney Grievance Commission of Maryland ("Petitioner" or "the Commission"), acting through Bar Counsel, filed a Petition for Disciplinary or Remedial Action ("PDRA") against Gayton Joseph Thomas, Jr., Esquire ("Respondent" or "Thomas"), charging him with violations of the Maryland Lawyers' Rules of Professional Conduct ("MLRPC") arising out of his representation of Mohamed Abou Sarieh Hamed ("Hamed"). Respondent was charged with violating MLRPC 1.1 (Competence),[1] 1.3 (Diligence),[2] 1.4 (Communication),[3] 8.1(b) (Bar

---

[1] Rule 1.1 provides:

> A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

Unless otherwise provided, all Rule references in this opinion are to the Maryland Lawyer's Rules of Professional Conduct ("MLRPC").

[2] Rule 1.3 provides:

> A lawyer shall act with reasonable diligence and promptness in representing a client.

[3] Rule 1.4 provides:

> (a) A lawyer shall:
>
> > (1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(f), is required by these Rules;

(Continued. . .)

Admission and Disciplinary Matters),[4] and 8.4(c) and (d) (Misconduct).[5] The

Commission served Thomas on 6 December 2013 with a copy of the PDRA, Writ of

(. . . continued)

(2) keep the client reasonably informed about the status of the matter;

(3) promptly comply with reasonable requests for information; and

(4) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Maryland Lawyers' Rules of Professional Conduct or other law.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

[4] Rule 8.1(b) provides:

An applicant for admission or reinstatement to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not:

\*          \*          \*

(b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this Rule does not require disclosure of information otherwise protected by Rule 1.6.

[5] Rules 8.4(c) and (d) provide:

It is professional misconduct for a lawyer to:

\*          \*          \*

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; [or]

(d) engage in conduct that is prejudicial to the administration of justice[.]

Summons, and Order for Hearing under Maryland Rule 16-752(a).[6] For reasons that we hope shall become clear in comparatively short order, we set out here the averments of the PDRA:

1. The Respondent, Gayton J. Thomas, Jr., Esquire was admitted to the Bar of the Court of Appeals of Maryland on June 21, 2000.
2. The Complainant, Mohamed Abou Sarieh Hamed, is a citizen of Egypt. Hamed retained Respondent in December 2009 to represent him in immigration proceedings. Hamed was placed in removal proceedings in October 2009.
3. On August 25, 2010, Respondent sent an email to Hamed's sister, setting forth a proposed course of action. Respondent indicated that he intended to file a motion to change venue from Arlington, Virginia to Baltimore, Maryland. He also intended to file an Application for Asylum with the Arlington Asylum Office.
4. Respondent incompetently represented Hamed. The asylum application could only be filed in Immigration Court because Hamed was already in removal proceedings. Also, an asylum application was untimely because it was not filed within one year after Hamed's arrival in the United States.
5. Respondent informed Hamed of a hearing scheduled in Immigration Court for September 9, 2010. However, on that date, Respondent told Hamed not to appear in court because the hearing had been canceled. In fact, the hearing was held and the Immigration Court ordered Hamed to be removed from the United States *in absentia*.
6. Hamed and his sister made numerous attempts to contact the Respondent to discuss the status of Hamed's case. Hamed's sister sent $700.00 for attorney's fees to Respondent four days after the September 9, 2010 hearing. Respondent did not respond to Hamed or his

---

[6] Bar Counsel did not serve upon Thomas a Request for Admissions of Fact or other discovery-related request, although it seems to us, in our experience, that that is done frequently by Bar Counsel. We note that a different Assistant Bar Counsel tried this case than filed it.

3

sister and did not inform them of the status of Hamed's case.

7. Hamed learned of the removal order in November 2012.
8. Respondent has not responded to several inquiries by the Petitioner related to Hamed's complaint.
9. Petitioner charges that Respondent, by his acts and omissions as described herein, engaged in professional misconduct as defined in Maryland Rule 16-701(i) and that he violated [MLRPC 1.1, 1.3, 1.4, 8.1, and 8.4].

(minor alterations added). Thomas did not file (timely or otherwise), under Maryland Rule 16-754, an Answer to the PDRA.

The case was assigned to a hearing judge in the Circuit Court for Baltimore County to conduct an evidentiary hearing and render findings of fact and recommended conclusions of law with regard to the charges. In view of there being no Answer to the PDRA, Petitioner filed a Motion for Order of Default. An order granting the motion was signed and an order entered. Thomas did not appear for the hearing. Hamed was the only witness called by Bar Counsel.[7] In the hearing judge's opinion, the following factual findings were made:[8]

> Mohamed Abou Sarieh Hamed ("Hamed" or "Mr. Hamed"), who filed with the Commission the

---

[7] In the written findings of fact (in a footnote), the hearing judge noted that Hamed's sister ("Ms. Hamed") was present in the courtroom and raised her hand as if desiring to volunteer some information. The hearing judge brought this to the attention of Bar Counsel, who indicated that it was not necessary to call Ms. Hamed as a witness. The hearing judge found later this to be "noteworthy" because virtually all of the written correspondence offered by Bar Counsel (and received by the judge) in evidence was between Ms. Hamed and Thomas and the sole retainer check entered in evidence as a physical corroboration given to Thomas was issued by her.

[8] We have summarized in our own footnotes many of the footnotes from the judge's opinion.

4

complaint against Thomas, is an Egyptian citizen. He was "admitted to the United States at New York, New York on or about October 11, 2008, as a nonimmigrant visitor (B-2) with authorization to remain in the United States for a temporary period not to exceed April 10, 2009." Hamed was placed in removal proceedings on October 28, 2009, when it was alleged that he "remained in the United States beyond April 10, 2009, without authorization from the Immigration and Naturalization Service or its successor the Department of Homeland Security." It was further alleged at that time that Hamed was "employed for wages or other compensation starting on April 10, 2009, at the People's Bureau of the Great Socialist People's Libyan Arab Jamahiriya in Washington, D.C.," again without proper authorization. Hamed was provided paperwork requiring him to appear before an immigration judge "to show why [he] should not be removed from the United States" based on the charges lodged. He was to appear at 901 North Stuart Street, Suite 1300, Arlington, Virginia, on "a date to be set" and at "a time to be set."

Roughly six weeks after he was placed in removal proceedings, on December 9, 2009, Hamed and his sister, Engie Abou Sarieh Hamed ("Ms. Hamed"),[9] first made Thomas's acquaintance at a social event. They met at a reception hosted by the Bahrain Embassy, where Ms. Hamed works as a communications officer.[10] At that time, Thomas introduced himself as an immigration lawyer. Hamed, his sister, and Thomas then discussed briefly Hamed's immigration issues. At the conclusion of their conversation, Thomas invited Hamed and his sister to meet at his office to discuss the matter in greater detail.

---

[9] The hearing judge noted that some of the documents introduced by Bar Counsel at the hearing referred to Hamed's sister as Engie, while others referred to her as Engi, for whatever that was worth.

[10] The hearing judge observed, in a footnote, that Hamed testified that he met Thomas in September 2009, at the Bahrain Embassy event. She observed further that Hamed was "most likely incorrect about the date," based on the information contained in Thomas's 10 December 2009 email, in which Thomas stated, "[i]t was a pleasure meeting [Ms. Hamed and Mr. Hamed] at the Bahrain celebration *last evening*." (emphasis added).

5

The following day, December 10, 2009, before any meeting took place, Thomas sent to Ms. Hamed an email with the subject line "immigration." In this lengthy email, Thomas recites the relevant facts, as he understands them to be, and outlines various options. Thomas mentions that Hamed arrived in the United States "a little over a year ago on a visitor visa" and "was detained by DHS/ICE for overstaying the period authorized by his visa." Thomas also indicates that Hamed "is a COPT from Egypt, but has not experienced threats or violence on account of his religion, and neither have his immediate family members." Thomas further indicates that Hamed "has a girlfriend, and they wish to marry."

In this same email, Thomas points out that, once married, Hamed's "wife can file a petition on his behalf." He adds that, "[b]ecause she is a US citizen, [Hamed] is eligible for a green card and would not be removed for overstaying his visa." Thomas raises the concern that, "[b]ecause they are getting married AFTER [he] was put into removal proceedings, US immigration law states that any such marriage is assumed to be fake (meaning fraudulent, or only entered for the purpose of staying in the United States)." Thomas closes the email by indicating that "the hardest part of this case will be proving that the marriage is bona fide." He emphasizes that "the most important thing to do is . . . to create as much evidence as possible, ie., create bank joint accounts, cell phone accounts, leases, joint property ownership, joint insurance policies, etc. . . ."

On December 13, 2009, Thomas, in an email to Ms. Hamed, confirms that "we are changing tracks and focusing on asylum rather than adjustment of status via marriage."[11] According to Thomas, the plan now is for the asylum application to be based on Hamed's "membership in a social group, i.e., those who are believed to be homosexual but are not, due to a rare disease that deprives the body of

[11] The hearing judge inferred that there must have been additional communication, either orally or in writing, after Thomas's 10 December 2009 email and before the 13 December 2009 email, because the December 13 email referred to "changing tracks." The hearing judge went on to note that neither Hamed's testimony nor any of the admitted documents shed light on this in-the-wind inference.

testosterone, and who as a result, will be persecuted." Thomas further explains that "the argument is not that the government is persecuting [Hamed], but rather that the government will not attempt to prevent others from harming him."

In a prior email, also dated December 13, 2009, Thomas asks Ms. Hamed to facilitate a conversation with Hamed's treating physician, presumably with the intent of obtaining information to support the anticipated asylum application. Hamed, pursuant to the request, reached out to Dr. Thompson via email two days later. In that email, Ms. Hamed tells Dr. Thompson that she has spoken with an attorney "to help [her] brother Mohamed so he can stay in the United States and can complete [his] treatment." She lets Dr. Thompson know that Thomas will be in touch. The record does not contain any indication that Dr. Thompson and Thomas ever spoke, although Thomas was copied on the email.

By email dated December 18, 2009, Thomas thanks Ms. Hamed (for something, at this point, unknown) and indicates that he "will most likely be in DC this Monday or Tuesday so that may be a good time to meet."[12] Thomas adds that he "will also try and find out when [Hamed's] first Immigration Court date is set to be scheduled." Other than an email dated January 19, 2010, in which Ms. Hamed simply informs Thomas that her brother has moved to Maryland, there appears to have been no additional written correspondence between the parties until March 23, 2010. On that date, in a 4:07 p.m. email, Thomas asks Ms. Hamed whether her "brother received his notice to appear in immigration court yet." On March 25, 2010, two days later, Thomas sent another email in which he indicates that he contacted the

---

[12] The hearing judge critiqued Hamed's testimony on this point, commenting that, although Hamed testified that he met with Thomas at Thomas's office in Baltimore a few days after their introduction, Hamed was not able to provide a specific date for that meeting. The judge went on to note that, based on the testimony and the documents provided, it was not possible to determine when the meeting took place or even if the meeting referred to in the 18 December 2009 email ever took place. Note was made further that Hamed testified that, at their first office meeting, he provided Thomas with a check for $450. A copy of that check was not introduced in evidence at the hearing.

immigration court in Arlington, Virginia and learned that there was no record of Hamed's case. According to Thomas, the "court clerk advised that the Department of Homeland Security has not yet forwarded [Hamed's] file to the court."

Five months later, on August 24, 2010, Ms. Hamed wrote to Thomas, requesting a status report. Thomas responded the following day, outlining the various steps that needed to be taken, as well as the anticipated costs of the asylum application and removal process. Notably, the exhibits offered by the Commission do not include any written confirmation of a hearing date scheduled for the removal proceedings. One is left to depend entirely on the testimony of Hamed for this information.

Via his sworn statement, Hamed claimed that he "had oral conversations with Thomas." Both in his written statement and at the March 19, 2014, hearing, Hamed indicated that his removal hearing was scheduled for September 9, 2010. According to Hamed's testimony, Thomas called on the morning of the hearing and told Hamed and his sister that "it was not necessary to go because there was not going to be a hearing." Hamed further testified that Thomas told him that the immigration court was "in summer recess." According to Hamed, Thomas assured him that there was "no clock on [his] case."

Four days following the scheduled hearing, Ms. Hamed provided to Thomas her check no. 286 in the amount of $700, with the indication that it was for "lawyer fees." On the same exhibit, there is what purports to be a message to Thomas from Ms. Hamed in which she indicates "that [they] must talk sometime this week to fix how [they] will meet in the first hearing date."[13] It would appear that Hamed and his sister, at least as of September 13, 2010, were laboring under the impression that the first hearing was to occur at some

---

[13] The hearing judge spied that that particular communication was undated, and that it was not clear whether the message had been conveyed actually to Thomas, and, if so, by what means. Rhetorically, she pondered, "Perhaps the typewritten message was included with the $700 check?" The judge concluded with the observation that no evidence was adduced as to whether Thomas ever received or cashed the check.

point still in the future. On September 20, 2011, one year later, Ms. Hamed emailed Thomas, mentioning that they had not heard from him in a "[l]ong time," and asking whether he had any news about the case.

Another year passed and Hamed married on September 16, 2012. According to Hamed, following his marriage, he learned, in November 2012, that the proceeding scheduled for September 9, 2010, had gone forward, and that he had been ordered removed. According to Hamed, he currently faces "serious immigration problems and fear[s] being deported back to Egypt." Hamed testified that he is scheduled for a hearing in immigration court in July 2014.[14]

On February 4, 2013, Hamed, with the assistance of his current immigration lawyer, filed with the Commission a complaint against Thomas. In that paperwork, Hamed claims that he "retained Thomas to represent [him] in removal proceedings before the Immigration Court in Arlington, Virginia." According to Hamed, "[a]lthough Thomas agreed to represent [him] and there was extensive correspondence between Thomas and [Hamed] or [his] sister, [he] later learned that [he] had been ordered removed *in absentia* on September 9, 2010." Hamed also indicates that he employed Thomas on September 13, 2010, and paid him $1,550.[15]

Hamed submitted with his complaint a letter from the immigration attorney, Alan M. Parra ["Parra"]. In this letter, Parra makes clear that he is writing on behalf of his client, Hamed. According to Parra, "[Thomas] provided erroneous legal advice by stating that he would file the application to the asylum office when [Hamed] was already in removal proceedings." Parra also alleges that Hamed "was initially informed orally by [Thomas] that he

---

[14] The judge faulted Bar Counsel for failing to provide written confirmation that the 9 September 2010 hearing took place, documentation delineating the decision reached at that hearing, or notices regarding the July 2014 immigration hearing.

[15] In a footnote, the judge recounted that Hamed testified that Thomas was paid initially $450 and later another $750. The judge reiterated that the demonstrative evidence confirmed only a check made payable to Thomas in the amount of $700, and that the record contained no indication that the $700 check was deposited or cashed.

would have to appear before the Immigration Court on September 9, 2010, but on that date Thomas told him by telephone that the hearing had been cancelled and that it was not necessary for Hamed to appear." According to Parra, "[Thomas's] failure to provide adequate representation has caused Hamed severe harm." It is Parra, on behalf of Hamed, who urges the Commission "to investigate this matter and to take the appropriate disciplinary action." Parra adds that the same "information will also be provided to the Immigration Court in support of a motion to reopen based upon ineffective assistance of counsel."

Upon receipt of Hamed's complaint, the Commission made inquiry of Thomas. In its initial correspondence, dated February 21, 2013, the Commission informed Thomas of the complaint and asked for a written response within 15 days. When Thomas failed to respond, the Commission sent another letter, this one dated March 20, 2013, requesting a reply within ten days. The March 20, 2013, letter was sent via certified mail, return receipt requested. The Commission pointed out that, if Thomas failed to respond, "the complaint made concerning [him] can only become one of increasing concern to [the] office and result in further steps by [the] office to resolve the matter." Thomas was reminded that, pursuant to Rule 8.1 of the Maryland Lawyers' Rules of Professional Conduct, "an attorney shall not knowingly fail to respond to a lawful demand for information from a disciplinary authority . . . ."

When there was still no response from Thomas, yet another letter was sent, this one on April 19, 2013. Thomas was asked to "submit a written response to [Hamed's] complaint" within ten days. He also was to enclose a copy of his client file. In addition, Thomas was asked to address specifically "the allegation that [he] intended to file an asylum petition at the Arlington Asylum Office when the petition should have been filed in Immigration Court" and "the claim that [he] advised [Hamed] not to appear at the September 9, 2010, hearing, resulting in an order for his removal." Thomas was reminded, yet again, of his responsibility to cooperate with the Commission's investigation. Still, Thomas did not respond. On May 3,

2013, the Commission sent a final letter to Thomas, again via certified mail, return receipt requested.[16] Thomas again was asked to provide a response to the complaint and again was reminded of his responsibility pursuant to Rule 8.1. Thomas did not respond.

(minor alterations added) (some internal footnotes omitted) (citations omitted). Based on her analysis of the record, the hearing judge concluded that the Commission failed to prove, by clear and convincing evidence adduced at the hearing, that Thomas violated MLRPC 1.1, 1.3, 1.4, or 8.4(c) or (d), although she was persuaded, by the same standard, that Thomas violated MLRPC 8.1.

Toward the beginning of her conclusions of law, the judge expressed displeasure at the completeness and quality of the evidence adduced at the hearing, describing her state of mind as regards the persuasive force of the same as that of one "feeling uneasy and unsure." Due to the coalescing of Thomas's lack of participation, the "casual[ness]" of Bar Counsel's presentation, and a simple lack of compelling evidence, the judge found herself "left with more questions than answers." She found Hamed's courtroom testimony "unclear in some areas and not credible in others."[17,18] For example, Hamed

---

[16] The judge complained also that the Commission did not provide her with copies of the paperwork confirming Thomas's receipt of either of the certified letters.

[17] Although at various points in the "Conclusions of Law" portion of the opinion the hearing judge discussed the various pieces of evidence that seemed to conflict or begged additional questions, she clarified rarely which portions of Hamed's testimony were to her simply unclear, as opposed to not being credible. When hearing judges find themselves with reactions similar to the evidence before them, they should be emboldened to, in the words of a Grammy-nominated pop song, "[s]ay what you want to say . . . I want to see you be brave." *Sara Bareilles, Brave*, on *The Blessed Unrest* (Epic Records 2013). The extra effort may sometimes be very important and helpful for

(Continued. . .)

11

testified that he met Thomas in September 2009 and visited him in his office a few days later. The judge found this testimony "inaccurate," in light of the December 2009 emails offered and received into evidence.[19] The judge noted also perceived discrepancies regarding how much Hamed claimed to have paid in fees to Thomas and when.[20]

Although the judge doubted initially when the attorney-client relationship was formed, she found ultimately sufficient "credible evidence presented and case law [to]

---

(. . . continued)
reviewing appellate courts. In any event, it is apparent generally that the hearing judge endeavored to carry-out conscientiously her responsibilities, based on the table set before her.

[18] In an early footnote, the opinion clarified that the hearing judge was "satisfied that the discrepancies in Hamed's testimony were not the result of a language barrier." Her view was that his command of the English language was sufficient to allow him to understand the questions posed.

[19] The hearing judge characterized this as being more than a "slight error," based on the date Hamed arrived in the United States. The judge observed that, if he had intended to apply for asylum, he would have needed to do so within a year of his arrival. The judge noted that if Hamed met with Thomas in September, there still would have been time to file an asylum application; but, if he did not meet Thomas until December, the deadline for filing an application would have passed already.

[20] Hamed testified that Thomas was paid initially $450 by check and an additional $750 later. In his "Detailed Statement," submitted with his initial complaint to the Commission, Hamed claimed that the second payment was $700, and that his payments to Thomas totaled $1,200. On the Complaint form itself, however, Hamed indicated that the total payments to Thomas were in the amount of $1,550. The hearing judge observed that the only objective corroborative demonstrative evidence received on the subject was a copy of a $700 check. In a footnote, the judge noted that no bank records of any kind were submitted.

A later footnote flagged Ms. Hamed's 25 August 2010 response to Thomas's email, in which she inquired as to how she should deliver "the first due money" to him. The judge concluded that the "inquiry certainly casts significant doubt on [Hamed's] testimony that $450 was paid to [Thomas] months earlier."

support the conclusion that an attorney-client relationship existed between [Thomas] and [Hamed] no later than December of 2009."[21]  Nonetheless, the judge continued: "What remains murkey [sic] is whether [Thomas] was retained, and, if so, when and exactly what he was hired to do."  She explained:

> *See* Exhibit 1, page 7, paragraph 3 where Thomas says: "The first thing I would do *if* [Hamed] retains me . . . ."  (Emphasis added.) . . . .
> Moreover, from the paperwork the Commission provided, it looks as though, immediately following their chance meeting at the Bahrain Embassy, Thomas followed up with a detailed email, outlining his understanding of the situation and the various options available.  Three days later, clearly following some other written or oral communication to which the undersigned has not been made privy, Thomas sent another email, indicating that they might meet the following week.  In March 2010, Thomas initiated contact with Ms. Hamed and asked if her "brother [had] received his notice to appear in immigration court yet?"  Based on this inquiry, it appears that Thomas was waiting to hear from the Hameds before proceeding.  Thus, as of March 2010, it is still unclear what role Thomas would have, if any, regarding Hamed's immigration issues.  Indeed, as late as August 25, 2010, it appears that Thomas and Ms. Hamed were still discussing possible options and costs.

(minor alterations added).

The hearing judge expressed also reservations with regard to a letter sent on Hamed's behalf by his replacement immigration attorney, Alan M. Parra, Esq., which was offered in evidence by Bar Counsel.  She regretted openly that Parra was not called

---

[21] The judge concluded this despite the fact that she noted that Hamed's original Complaint to the Commission indicated that he employed Thomas on 13 September 2010, four days after the alleged removal hearing.  She did not speculate whether this could have been a typographical error.

as a witness because his letter did not contain detailed information as to his background, training, or qualifications.  Accordingly, the judge found that the conclusory statements in his letter were insufficient support from which to conclude that Thomas violated any of the MLRPC at issue.  Worse yet, drawing on the existence of Parra's letter, she speculated that Hamed's Complaint to the Commission may have been filed with ulterior motives:

> Interestingly, Mr. Parra points out "that this information will be provided to the Immigration Court in support of a motion to reopen based upon ineffective assistance of counsel." Thus, it appears that the complaint was filed, at least in part, with the hope of gathering ammunition for further proceedings before the immigration court.

Finally, the hearing judge expressed misgivings that perhaps certain emails received into evidence had been altered.  For example, she observed that at 9:43 a.m. on 18 December 2009, Ms. Hamed emailed Thomas some "additional information," although nothing was reflected in the body of the email nor were any attachments submitted in evidence.  In two other instances, the same email was submitted into evidence twice (once as a part of a reply-chain in each case), but with conflicting time stamps.[22]

The judge concluded ultimately that Petitioner had proven by clear and convincing evidence only that Respondent violated MLRPC 8.1 in knowingly failing to respond to the Commission's repeated lawful demands for information.

---

[22] *See infra* note 23.

Petitioner filed with us written exceptions to the hearing judge's Findings of Fact and Conclusions of Law. First, Bar Counsel argued that the findings of fact were incompatible with the Order of Default entered previously in the case, based on Thomas's failure to file an answer, failure to move to vacate the order, and failure to appear at the hearing.

Second, Petitioner took a rare exception to the judge's credibility determinations. Interpreting the hearing judge's determinations as posited primarily on her calling-out minor discrepancies in the evidence as to dates, amounts, and a misunderstanding of time stamps,[23] Bar Counsel argued that the credibility determinations, in gross, were clearly erroneous. Particularized exceptions were noted also to a variety of specific factual findings, including the judge's reflections whether Thomas was retained at all by Hamed, whether live expert testimony was needed on the subject of the operation of immigration law, whether the 9 September 2010 immigration hearing occurred and what its outcome was, and whether certain fees were paid to Thomas. The essence of each of these exceptions was grounded on the notion that the hearing judge doubted improperly the credibility of Hamed and, regardless, those material facts had been established before the hearing by virtue of entry of the default order against Thomas.

---

[23] In the Exceptions, Bar Counsel speculated that Thomas may have been in Germany at the time that some of the emails were sent, and that the time difference between the United States (Eastern Standard Time) and Germany (Central European Time) is five or six hours, depending on whether daylight savings time was in effect. Bar Counsel suggested that perhaps the times on the emails could vary depending on the location of the computer being used or even the specific brand or type of computer being used. It does not appear to us from our review of the hearing transcript that the hearing judge was given the full benefit of this largely post-hoc rationale.

15

Finally, Petitioner took exception to the hearing judge's conclusions of law. The Commission's argument here is but another iteration of its arguments that the material facts and violations of the Rules were established already by the default order.

## II. OUR STANDARD OF REVIEW AND ORIGINAL JURISDICTION SHOW THE WAY

The Court of Appeals has original jurisdiction over attorney discipline matters. *Attorney Grievance Commission v. Kremer*, 432 Md. 325, 334, 68 A.3d 862, 867 (2013). Accordingly, we "conduct an independent review of the record." *Attorney Grievance Commission v. Garfield*, 369 Md. 85, 97, 797 A.2d 757, 763 (2002) (internal citations omitted). "We determine, ultimately, whether an attorney has committed the misconduct charged by the Attorney Grievance Commission." *Attorney Grievance Commission v. Maignan*, 390 Md. 287, 292, 888 A.2d 344, 347 (2005). Ordinarily, in accordance with Maryland Rule 16-752, we refer petitions for disciplinary action to a circuit court judge to act as our hearing officer, for that judge to receive evidence and thereafter present to the Court findings of fact and recommended conclusions of law. *See Maignon*, 390 Md. at 292–93, 888 A.2d at 347. Exceptions may be taken by the parties to the findings of fact, proposed conclusions of law, or both. We review the judge's recommended conclusions of law without deference, a standard referred to sometimes as *de novo*. Md. Rule 16-759(b)(1); *see Attorney Grievance Commission v. Greenleaf*, 438 Md. 151, 156, 91 A.3d 1066, 1069 (2014) ("In an attorney discipline proceeding, this Court reviews for clear error the hearing judge's findings of fact, and reviews without deference the hearing judge's conclusions of law."); *Attorney Grievance Commission v. Moeller*, 427 Md. 66,

16

73, 46 A.3d 407, 411 (2012) ("With respect to a hearing judge's conclusions of law, no deference applies and we review those conclusions *de novo*."); *Attorney Grievance Commission v. Patterson*, 421 Md. 708, 724, 28 A.3d 1196, 1206 (2011) ("We grant no deference to the hearing judge's proposed conclusions of law; those, we review *de novo*."). If no exceptions are filed with respect to the hearing judge's findings of fact, we may "treat the findings of fact as established for the purpose of determining appropriate sanctions, if any." Md. Rule 16-759(b)(2)(A). If exceptions are filed, we must determine whether the findings of fact are clearly erroneous. Md. Rule 16-759(b)(2)(B); *see Attorney Grievance Commission v. Stolarz*, 379 Md. 387, 397, 842 A.2d 42, 47 (2004) ("We . . . accept[] the hearing judge's findings of fact unless clearly erroneous.").

Ordinarily, when assessing the hearing judge's findings of fact, we "give due regard to the opportunity of the hearing judge to assess the credibility of witnesses." Md. Rule 16-759(b)(2)(B). The hearing judge's credibility determinations are *not* entitled to deference, however, when "the credibility decision is so contrary to the unexplained, unimpeached, unambiguous documentary evidence as to be inherently incredible and unreliable." *Maignan*, 390 Md. at 295, 888 A.2d at 349 (2005) (quoted in *Kusi v. State*, 438 Md. 362, 384, 91 A.3d 1192, 1204 (2014)). The opinion in *Maignan* offers an illustration of this principle: "If the check admitted into evidence was blue in color, and we could see it was blue in color, we certainly would not accept the judge's crediting of the office manager's testimony that it was yellow." *Id.* Ultimately, "[i]t is . . . for us, however, to determine whether the judge's findings are, indeed, supported by substantial

17

evidence." *Maignan*, 390 Md. at 293, 888 A.2d at 347. The bar is set high for the exceptor, and purposefully so.

### III. THE NEGLECTED, BUT NOT IGNORED, ORDER OF DEFAULT

At the outset of her opinion, the hearing judge recognized that, pursuant to Maryland Rule 2-323(e), "[a]verments in a pleading to which a responsive pleading is required . . . are admitted unless denied in the responsive pleading . . . ." *See also* Md. Rule 16-754 (requiring the timely filing of an answer to a PDRA and providing what happens when there is a default). She conceded that, "*if reviewed in a vacuum and accepted as true, the averments set forth in the [PDRA] are sufficient to establish violations of MLRPC 1.1, 1.3, 1.4, 8.1, and 8.4 as alleged by the Commission.*" (emphasis added). From her perspective, however, "the evidence submitted at the hearing casts doubt on the claims made in the petition." Curiously, pursuant to Rule 2-323(e), and acknowledged elsewhere in her opinion, she deemed only one fact admitted due to Thomas having filed no responsive pleading to the PDRA: Thomas was admitted to the Bar of the Court of Appeals of Maryland on 21 June 2000.

In the Exceptions, Bar Counsel argued that the bulk of the hearing judge's findings of fact were incompatible with the admitted material facts established by the Order of Default. Relying on *Attorney Grievance Commission v. Lee*, 390 Md. 517, 890 A.2d 273 (2006), and *Franklin Credit Management Corporation v. Nefflen*, 436 Md. 300, 81 A.3d

18

441 (2013), Petitioner argues that Maryland Rule 16-754(c)[24] obliged the hearing judge to treat a failure to file a timely answer as a default, and Rule 2-323(e)[25] obliged the hearing judge to treat averments in pleadings as admitted unless denied. According to Bar Counsel, once an Order of Default is entered, it functions as a determination of liability that may be revisited only by a timely Motion to Vacate. Thus, the hearing judge should not have "disregard[ed] [Rule 2-323(e)], disregard[ed] the averments which have been admitted as true, pick[ed] apart the record, [found] the Complainant not credible, and fail[ed] to find violations of [most of the Rules at issue]."[26]

---

[24] Rule 16-754(c) provides:

> Failure to answer. If the time for filing an answer has expired and the respondent has failed to file an answer in accordance with section (a) of this Rule, the court shall treat the failure as a default and the provisions of Rule 2-613 shall apply.

Rule 2-613 states, in pertinent part, that if a motion to vacate an order of default has not been filed,

> [T]he court, upon request, may enter a judgment by default that includes a determination as to liability and all relief sought . . . .

[25] Rule 2-323(e) provides:

> Effect of failure to deny. Averments in a pleading to which a responsive pleading is required, other than those as to the amount of damages, are admitted unless denied in the responsive pleading or covered by a general denial. Averments in a pleading to which no responsive pleading is required or permitted shall be taken as denied or avoided. . . .

[26] We digress here to underscore a few points that invite comment, based on our review of this record. Bar Counsel who move successfully for an order of default are

(Continued. . .)

encouraged to think critically about their on-going litigation strategy, i.e., whether and how supplementary evidentiary hearings might further or hinder their legitimate goals. A cost-benefit assessment may caution restraint, trumping a desire to embellish further the factual record established by the default order. The extra effort may waste time and resources generally, unless it is worthwhile because new material evidence comes to light after filing the PDRA, or for some similar reason. As noted below, this does not appear to have been the motive here for launching into a full-blown evidentiary hearing, as if no default order had been entered.

Rule 2-613(f) suggests the appropriate scope of an evidentiary hearing conducted after an Order of Default is entered in a generic civil case:

> If, in order to enable the court to enter judgment, it is necessary to take an account or to determine the amount of damages or to establish the truth of any averment by evidence or to make an investigation of any matter, the court may rely on affidavits, conduct hearings, or order references as appropriate, and, if requested, shall preserve to the plaintiff the right of trial by jury.

In the context of a default attorney grievance proceeding, the Rule should be understood that, after an order of default has been entered, the taking of additional evidence may be warranted only when, as noted above, new and material evidence has come to light since the filing of the PDRA, or perhaps when the hearing judge expresses doubt as to certain averments (or absence thereof) and invites live testimony or additional demonstrative evidence. Discussions between Bar Counsel and hearing judges regarding the potential need for or desirability of additional evidence in a default situation might occur appropriately during a pre-hearing scheduling conference, for example.

At the evidentiary hearing here, Bar Counsel suggested to the hearing judge that he intended to "be brief this morning only because we have submitted [the] complaint as well as several other pieces of information." Later in the hearing, the following exchange took place between Bar Counsel and the hearing judge:

> [Bar Counsel]: Your Honor, I guess what I'm trying to point out is we brought [Hamed] here to really put a face on the story, but we have prepared his complaint and the documents that we've submitted into evidence that are very thorough including dates and specific information. So, I apologize to the Court if it appears that we're kind of glossing over a lot of this information—

(Continued. . .)

20

In *Nefflen*, we had occasion to consider the nature of an order of default in a different setting than an attorney disciplinary matter. 436 Md. 300, 81 A.3d 441. In that civil action between a mortgagor and mortgage servicer over an alleged breach of a settlement agreement, we reviewed at length the statutory history and meaning of Rule 2-613. Considering whether a party may contest liability after a default judgment has been entered, we held that, although a default order is not itself a judgment, defaulting defendants could not use Rule 2-534 to "revisit issues of liability established by an unvacated order of default." *Nefflen*, 436 Md. at 324, 81 A.3d at 455. Instead, an order of default determines liability conclusively, and such a determination may be set aside only if the defendant moves successfully to vacate the order. *Nefflen*, 436 Md. at 317–18, 81 A.3d at 451–52. The hearing judge's sole remaining task at the resultant evidentiary hearing is to determine damages. *Id.*

*Lee* is instructive, as the procedural history in that case resembles fairly that of the present matter. There the respondent did not answer the Commission's petition, and

---

(. . . continued)

> THE COURT: It does appear that way.
>
> [Bar Counsel]: —but I think that for the purpose of making sure we have everything accurate, we have already included that in our evidence, and [Hamed] is just here to tell his story and answer any questions of the Court.

Although Bar Counsel may be correct that the evidentiary hearing may be important sometimes in putting a "face" on a complaint, as well as developing the effect of attorney misconduct on clients, such hearings may do more harm than good ultimately, as appears to have been the case here, by attempting to apply too many additional layers of gloss to already-established facts, so as to obscure and bring into doubt the clarity of the thorough and well-pleaded facts from a PDRA.

accordingly an Order of Default was entered. *Lee*, 390 Md. at 520, 890 A.2d at 274. The respondent filed a Motion to Vacate Order of Default, which was denied. *Lee*, 390 Md. at 520, 890 A.2d at 275. The hearing judge disagreed initially with Bar Counsel's position that the averments contained in the [Petition for Disciplinary Action] were deemed admitted by operation of Rules 2-613(f) and 2-323(e), and conducted "an unnecessarily protracted evidentiary hearing." *Lee*, 390 Md. at 524, 890 A.2d at 277; *see id.* n.7. Later in that proceeding, recognizing that the matter should proceed more appropriately by default, the hearing judge found "'that th[e] allegations [of the Petition for Disciplinary Action] having not been joined at issue by way of an answer are to be considered as true for purposes of the court's decision in making Conclusions of Law in this case.'" *Id.* n.7 (internal quotations omitted). Nonetheless, the hearing judge found that the respondent did not violate one of the rules with which he was charged (MLRPC 1.4), to which conclusion Bar Counsel took exception. The *Lee* Court held that, in light of the default order:

> [T]he [hearing] court should have treated the averments as established pursuant to Rules 16-754(c) and 2-323(e). Rule 16-754(c) permits the court to treat failure to file a timely answer as a default, and Rule 2-323(e) permits the court to treat the averments in a pleading as admitted unless denied. Because the averments were not denied, we treat them as admitted."

*Lee*, 390 Md. at 523–24, 890 A.2d at 277. The Court of Appeals proceeded to find that Respondent violated MLRPC 1.4, in addition to the other charged violations.

*Attorney Grievance Commission v. Harmon*, 433 Md. 612, 72 A.3d 555 (2013), proceeded similarly. There, the respondent also did not answer the Commission's

petition, nor did he respond to Requests for Admission of Fact and Genuineness of Documents. *Harmon*, 433 Md. at 618, 72 A.3d at 559. An Order of Default was entered pursuant to Bar Counsel's Motion. *Id.* Harmon appeared at the hearing, clutching an Answer and Opposition to Motion to Default, which he sought to file untimely. The hearing judge rejected respondent's belated initiative. *Harmon*, 433 Md. at 618–19, 72 A.3d at 559. Pursuant to *Lee* and Md. Rule 2-323(e), the hearing judge deemed (appropriately) the factual averments made in the PDRA as admitted.[27] *Id.*; *see also Attorney Grievance Commission v. Lawson*, 428 Md. 102, 106, 50 A.3d 1196, 1198, n.1 (2012) ("As a result of the default, the averments contained in the Commission's [Petition for Disciplinary Action] were deemed admitted, and we consider them as true under Rules 2-613(f) and 2-323(e)."); *Attorney Grievance Commission v. Steinberg*, 395 Md. 337, 352, 910 A.2d 429, 437–38 (2006); *Attorney Grievance Commission v. Kapoor*, 391 Md. 505, 530, 894 A.2d 502, 517 (2006).

The well-pleaded averments in the PDRA in the present case were not denied. An Order of Default was entered in the case, and not vacated. Thus, we accept those averments as admitted.[28] We shall not consider the hearing judge's findings of fact and conclusions of law (or Bar Counsel's exceptions to them) because there was no apparent need for a full-blown evidentiary hearing in this case, although we recognize that our

[27] The hearing judge also deemed admitted the matters contained in the Requests for Admission of Facts and Genuineness of Documents pursuant to Md. Rule 2-424(b). *See supra* note 6.

[28] Had Bar Counsel and the hearing judge been on that same page before the hearing, it appears no full-blown hearing (and the ensuing confusion) may have occurred.

23

conclusion in this latter regard is reached only with the benefit of hindsight. Based on the deemed admissions, we conclude that the admitted facts are sufficient, to a clear and convincing standard, to warrant concluding that Respondent violated MLRPC 1.1, 1.3, 1.4, 8.1, and 8.4(c) and (d).[29]

## IV. HOW WE GET THERE

### A. MLRPC 1.1 (Competence)

MLRPC 1.1 provides:

> A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

Attorneys may violate MLRPC 1.1 although they might have the requisite skill or knowledge to represent a client. *Attorney Grievance Commission v. De La Paz*, 418 Md. 534, 553, 16 A.3d 181, 192 (2011). Competency includes, "at a minimum, the attorney's presence at any court proceeding for which he or she was retained, absent an acceptable explanation for that attorney's absence." *Attorney Grievance Commission v. Harris*, 366 Md. 376, 403, 784 A.2d 516, 531 (2001); *see De La Paz*, 418 Md. at 553–54, 16 A.3d at 193 (finding that an attorney violated MLRPC 1.1 when he failed to appear before the court in his client's case). If an attorney "fails to act or acts in an untimely manner, resulting in harm to his or her client," generally this Court finds a violation of MLRPC 1.1. *Attorney Grievance Commission v. Brown*, 426 Md. 298, 319, 44 A.3d 344, 357

---

[29] The hearing judge would have reached this conclusion had no full-blown evidentiary hearing been held and the well-pleaded facts in the PDRA acknowledged as admitted. *See supra* p. 18.

24

(2012). Evidence that an attorney failed "to apply the requisite thoroughness and/or preparation in representing a client is sufficient alone to support a violation of Rule 1.1." *Attorney Grievance Commission v. McCulloch*, 404 Md. 388, 398, 946 A.2d 1009, 1015 (2008); *see Attorney Grievance Commission v. Garrett*, 427 Md. 209, 223, 46 A.3d 1169, 1177 (2012) (concluding that failure to take "necessary, fundamental steps to further the client's case" is a violation of MLRPC 1.1). In the present matter, Respondent's behavior violated MLRPC 1.1 through his failure to appear at Hamed's 9 September 2010 hearing and by telling Hamed that he did not need to appear at the hearing. Respondent violated further MLRPC 1.1 by suggesting that an asylum application could be filed anywhere other than in Immigration Court. The failure to pursue properly an asylum application for Hamed, as well as the failure of anyone to appear in court at the deportation hearing, caused direct and material harm to Hamed, as he has now been ordered removed.

*B. MLRPC 1.3 (Diligence)*

MLRPC 1.3 provides:

> A lawyer shall act with reasonable diligence and promptness
> in representing a client.

An attorney may violate MLRPC 1.3 by doing "nothing whatsoever to advance the client's cause or endeavor." *Attorney Grievance Commission v. Baghat*, 411 Md. 568, 575, 984 A.2d 225, 229 (2009). In *Kremer*, where clients were unable to discern the status of their case after repeated attempts to reach their attorney, we held that the failure to keep one's client informed of his or her case violates MLRPC 1.3 and 1.4. 432 Md. at

25

331–32, 68 A.3d at 865–66; *see Attorney Grievance Commission v. Park*, 427 Md. 180, 192–93, 46 A.3d 1153, 1160 (2012) (holding that a lawyer's failure to keep the clients informed as to the status of the applications and his failure to respond to the clients' inquiries violated MLRPC 1.3); *Attorney Grievance Commission v. Walker-Turner*, 428 Md. 214, 229, 51 A.3d 553, 562 (2012) ("Walker-Turner violated MLRPC 1.3 also by failing to ascertain the status of his clients' case after he missed the trial."). It is hard to identify what, if anything, Respondent did to advance Hamed's cause; indeed, he jeopardized it materially. Respondent advised Hamed not to appear at the 9 September 2010 hearing, and failed to appear himself. He simply stopped responding to the Hameds as they attempted to contact him to ascertain the status of Hamed's case. He failed to inform Hamed that he had been ordered removed. He accepted payment for work that he did not do. These serious missteps constitute a violation of MLRPC 1.3.

### C. MLRPC 1.4 (Communication)

MLRPC 1.4 provides:

> (a) A lawyer shall:
>
> > (1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(f), is required by these Rules;
> > (2) keep the client reasonably informed about the status of the matter;
> > (3) promptly comply with reasonable requests for information; and
> > (4) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Maryland Lawyers' Rules of Professional Conduct or other law.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

Attorneys violate MLRPC 1.4 when they fail to communicate with their clients and keep them informed of the status of their legal matters, especially when clients attempt repeatedly to speak with them. *Attorney Grievance Commission v. Kwarteng*, 411 Md. 652, 658, 984 A.2d 865, 868–69 (2009). In *De La Paz*, respondent failed to respond to his client's numerous telephone messages and letters. 418 Md. at 554, 16 A.3d at 192–93. Respondent in that matter also failed to tell his client that his case had been dismissed, which fact the client learned only after traveling to the courthouse to inquire. *Id.* Similarly, in *Attorney Grievance Commission v. Fox*, we found that the attorney violated MLRPC 1.4 when he did not know that the client's case was dismissed and accordingly did not communicate that fact to the client. 417 Md. 504, 517, 11 A.3d 762, 769 (2010). Like the attorneys in *De La Paz* and *Fox*, Respondent violated MLRPC 1.4 when he ceased communicating with the Hameds after the 9 September 2010 hearing. Respondent told Hamed not to appear at his deportation hearing, and then failed to tell Hamed that he had been ordered *in abstentia* removed.

### D. MLRPC 8.1(b) (Bar Admission and Disciplinary Matters)

MLRPC 8.1(b) provides:

> An applicant for admission or reinstatement to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not:
>
> \*　　　　　\*　　　　　\*
>
> (b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful

27

demand for information from an admissions or disciplinary authority, except that this Rule does not require disclosure of information otherwise protected by Rule 1.6.

This Rule requires attorneys to answer timely requests from the Attorney Grievance Commission regarding complaints in potential disciplinary matters. *See Brown*, 426 Md. at 323, 44 A.3d at 359; *Garrett*, 427 Md. at 226, 46 A.3d at 1179. Here, Respondent failed to respond to Petitioner's repeated lawful demands for information on February 21, March 20, April 19, and 3 May 2013, each of which requested information about Respondent's representation of Hamed.

### E. MLRPC 8.4(c) and (d) (Misconduct)

MLRPC 8.4(c) and (d) provide:

> It is professional misconduct for a lawyer to:
> *     *     *
> (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; [or]
> (d) engage in conduct that is prejudicial to the administration of justice[.]

A "broad universe of misbehavior" is encompassed by MLRPC 8.4(c). *Attorney Grievance Commission v. McDonald*, 437 Md. 1, 39, 85 A.3d 117, 140 (2014). "Dishonesty" is "the broadest of the four terms, and encompasses, *inter alia*, 'conduct evincing a lack of honesty, probity or integrity of principle; [a] lack of fairness and straightforwardness. . . . Thus, what may not legally be characterized as an act of fraud, deceit or misrepresentation may still evince dishonesty.'" *McDonald*, 437 Md. at 39–40, 85 A.3d at 140 (quoting *Attorney Grievance Commission v. Sheridan*, 357 Md. 1, 25, 741 A.2d 1143, 1156 (1999)). Clients trust rightfully their attorneys with their most private

28

affairs, and accordingly attorneys must exercise "the utmost good faith, fairness, and fidelity" towards them. *Attorney Grievance Commission v. Potter*, 380 Md. 128, 149, 844 A.2d 367, 379 (2004) (internal quotations omitted). Attorneys violate MLRPC 8.4(c) when they misrepresent to their clients the status of their clients' cases, or conceal material information from their clients, even if they have not misrepresented explicitly the information. *Brown*, 426 Md. at 324, 44 A.3d at 359–60. Respondent misrepresented to Hamed the status of his case when he told him that he did not need to appear at the 9 September 2013 hearing and further failed to tell him that he had been ordered removed.

Violations of MLRPC 8.4(d) may occur when attorneys fail to keep their clients advised of the status of their representation or, more grievously, fail to represent diligently their clients. In *Park*, the violations of MLRPC 1.1, 1.3, and 1.4 together constituted a violation of MLRPC 8.4(d), as such behavior "constitute[d] conduct that brings disrepute to the legal profession." 427 Md. at 194, 46 A.3d at 1161; *see Attorney Grievance Commission v. Rose*, 391 Md. 101, 111, 892 A.2d 469, 475 (2006) (describing conduct that "tends to bring the legal profession into disrepute and is therefore prejudicial to the administration of justice"). Conduct prejudicial to the administration of justice is that which "reflects negatively on the legal profession and sets a bad example for the public at large." *Attorney Grievance Commission v. Goff*, 399 Md. 1, 22, 922 A.2d 554, 566 (2007). A failure by an attorney to appear in court at a hearing on behalf of his or her client constitutes conduct prejudicial to the administration of justice because:

29

> [A]n attorney plays such an integral role in the judicial process that without his presence the wheels of justice must, necessarily, grind to a halt. The attorney's absence from the courtroom is immediately cognizable by the judge and intrudes upon the operation and dignity of the court.

*Walker-Turner*, 428 Md. at 232, 51 A.3d at 564 (quoting *Attorney Grievance Commission v. Ficker*, 319 Md. 305, 315, 572 A.2d 501, 506 (1990)). As in *Park*, Respondent's conduct here giving rise to violations of MLRPC 1.1, 1.3, and 1.4 constitutes a violation of MLRPC 8.4(d) as well. By taking Hamed's case, failing to appear at his 9 September 2010 hearing, taking payments from the Hameds, and then disappearing essentially, Respondent brought disrepute upon the legal profession and caused prejudice to the administration of justice in Hamed's immigration matter.

## V. SANCTION

When determining the appropriate sanction to impose on an errant attorney, we are mindful that the chief purpose of the sanction is to protect the public. *Attorney Grievance Commission v. Culver*, 371 Md. 265, 277, 808 A.2d 1251, 1258 (2002). Sanctions also are "designed to effect general and specific deterrence." *Attorney Grievance Commission v. Wallace*, 368 Md. 277, 289, 793 A.2d 535, 543 (2002); *see McDonald*, 437 Md. at 45, 85 A.3d at 143 ("Our guiding principle in determining sanctions for ethical violations is our interest in protecting the public and the public's confidence in the legal profession." (internal quotations omitted)). We look not to the number of rules broken, but to the lawyer's conduct. *See Attorney Grievance Commission v. Briscoe*, 357 Md. 554, 568, 745 A.2d 1037, 1044 (2000).

30

In determining the appropriate sanction, we consider the facts of the case, while balancing any aggravating or mitigating factors. *Kremer*, 432 Md. at 339, 68 A.3d at 870. Mitigation "is not on the table, however, without the attorney providing supporting evidence of the existence of such factors." *Id.* As Respondent has not participated in any way during these proceedings, there are no mitigating factors to consider. In weighing possible aggravating factors, we turn, as we often do, to the suggested factors of the American Bar Association:

> (a) Prior disciplinary offenses;
> (b) Dishonest or selfish motive;
> (c) A pattern of misconduct;
> (d) Multiple offenses;
> (e) Bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;
> (f) Submission of false evidence, false statements, or other deceptive practices during the disciplinary process;
> (g) Refusal to acknowledge the wrongful nature of conduct;
> (h) Vulnerability of victim;
> (i) Substantial experience in the practice of law;
> (j) Indifference to making restitution;
> (k) Illegal conduct, including that involving the use of controlled substances.

American Bar Association, *Standards for Imposing Lawyer Sanctions*, § 9.22, Compendium of Professional Responsibility Rules and Standards (2012); *see Attorney Grievance Commission v. Coppock*, 432 Md. 629, 648, 69 A.3d 1092, 1103 (2013). Of the suggested list, factors (e), (g), (h), and (j) are implicated by the admitted facts in the case at hand. Respondent failed intentionally to participate in the disciplinary proceedings or comply with the information requests of the Commission. Absence from the proceedings also indicates a refusal to acknowledge the wrongful nature of his

31

conduct and indifference to making restitution to Hamed for the circumstances in which he was left in the lurch. Finally, we consider the vulnerable nature of Hamed's status. We have recognized previously the special vulnerability of immigrants as clients. *See Attorney Grievance Commission v. Brisbon*, 422 Md. 625, 642, 31 A.3d 110, 120 (2011) (describing the purposes of the Maryland Immigration Consultant Act, Maryland Code (1975, 2013 Repl. Vol.) §§ 3301–3306, as "to offer simple protection to extremely vulnerable people, largely unable or unwilling as a practical matter to defend themselves, from being preyed on").

Disbarment is warranted in cases involving flagrant neglect of client affairs, including the failure to communicate with clients or respond to inquiries from Bar Counsel. *Kremer*, 432 Md. 325, 68 A.3d 862 (determining that disbarment was appropriate for an attorney's neglect and abandonment of clients' cases); *Attorney Grievance Commission v. Dunietz*, 368 Md. 419, 431, 795 A.2d 706, 712 (2002) ("Respondent's continuing disregard for the Attorney Grievance Process, his apparent indifference to the tenets of his chosen profession, the dereliction of his duties to his client and his ostensible lack of remorse for his misconduct, warrant [disbarment].").

The attorney in *Attorney Grievance Commission v. Lara* committed offenses similar to those of Respondent in this matter. 418 Md. 355, 14 A.3d 650 (2011). In that matter, Lara collected advance fees from two clients and abandoned his representation of them, ceasing all communications. Because Lara did not keep his clients apprised of his changed contact information, did not complete the legal work for which he was retained, and did not issue a fee refund once he terminated his practice, we determined that

32

disbarment was the appropriate sanction. Lara also failed to cooperate with Bar Counsel and demonstrated a lack of professionalism in that he never responded formally to any of the complaints filed against him. Respondent in this matter also failed to communicate with his client, failed to complete any of the work that he was retained to complete, and failed to participate in these proceedings in any way.

Thomas's misconduct warrants the sanction of disbarment.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THE COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16-761(b), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST GAYTON JOSEPH THOMAS, JR.**

Circuit Court for Baltimore County
Case No. 03-C-13-13179
Argued: 7 October 2014

IN THE COURT OF APPEALS OF
MARYLAND

Misc. Docket AG No. 63

September Term, 2013

---

ATTORNEY GRIEVANCE
COMMISSION OF MARYLAND

v.

GAYTON JOSEPH THOMAS, JR.

---

Barbera, C.J.,
Harrell,
Battaglia,
Greene,
Adkins,
McDonald,
Watts,

JJ.

---

Concurring Opinion by McDonald, J.

---

Filed:  November 20, 2014

This is one of those cases where no good deed goes unpunished. Bar Counsel attempts to put a face on a cold record of default and the defaulter prevails. The hearing judge conscientiously sifts the evidence provided, making the credibility determinations on which we normally rely, and that effort is found unnecessary. I concur in the Court's disposition and write simply to make a suggestion.

The Majority opinion provides, in footnotes 17 and 26, some helpful advice to Bar Counsel and hearing judges on how to deal with situations, not uncommon, in which an attorney accused of misconduct fails to respond to the charges. Perhaps it is worth incorporating some of that good advice in our rules or in the standard referral order to hearing judges to make it more readily accessible than a Westlaw search.