*Attorney Grievance Commission of Maryland v. Keith M. Bonner*, Miscellaneous Docket AG No. 51, September Term, 2020, Opinion by Booth, J.

**ATTORNEY DISCIPLINE – SANCTIONS – DISBARMENT**

Respondent Keith M. Bonner violated the District of Columbia Rules of Professional Conduct ("D.C. Rules") 8.4 (a), (b), and (c) by misappropriating funds from his law firm over a period of several years and making numerous knowing and intentional misrepresentations to principals and employees at his law firm to conceal the misconduct. Considering the nature of Mr. Bonner's misconduct and the various mitigating and aggravating factors present here, the Court of Appeals concluded that disbarment is the appropriate sanction.

Circuit Court for Montgomery County
Case No.: 484242-V
Argued: November 8, 2021

IN THE COURT OF APPEALS

OF MARYLAND

Misc. Docket AG No. 51

September Term, 2020

_____

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

KEITH M. BONNER

_____

Getty, C.J.
*McDonald
Watts
Hotten
Booth
Biran
Gould,

JJ.

_____

Opinion by Booth, J.

_____

Filed: March 3, 2022

*McDonald, J. now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled Pursuant to MD Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

"How much more grievous are the consequences of anger than the causes of it."

> Aurelius, Marcus. 2014. *Meditations*. Translated by Martin Hammond. Penguin Pocket Hardbacks. London, England: Penguin Classics.

In this attorney grievance proceeding, we must determine the sanction to impose for an attorney's misconduct involving misappropriation of funds from his law firm in which he was a founding partner and member for decades. Respondent Keith Bonner freely admits to the facts of the misconduct and resulting violations of the professional ethical rules applicable to his misconduct. The case he presents to this Court in his defense relates almost exclusively to the mitigating factors that this Court should consider when imposing a sanction (in addition to one aggravating factor to which he excepts). Specifically, he asserts that he has shown sufficient mitigating circumstances to justify a deviation from our case law, which generally imposes the sanction of disbarment where an attorney's misconduct involves theft or intentional misappropriation of funds. Prior to our consideration of the sanction, as we always do, we shall describe the procedural history, as well as the hearing judge's findings of fact and conclusions of law. We shall then discuss our case law concerning sanctions where intentional misconduct involves theft or misappropriation, as well as Mr. Bonner's argument that we should consider the emotional problems that he experienced during the period of his misconduct—anger, frustration, and feelings of entitlement and self-righteousness—as a mitigating factor in this case, along with the other mitigating factors that are present here, which he asserts warrant the imposition of a sanction less than disbarment.

On November 30, 2020, the Attorney Grievance Commission of Maryland ("Commission"), acting through Bar Counsel, filed a Petition for Disciplinary or Remedial Action ("Petition") against Respondent Keith M. Bonner, in connection with his misappropriation of funds from his former law firm. The Petition alleged that Mr. Bonner violated the Maryland Attorneys' Rules of Professional Conduct 19-308.4(a), (b), (c) and (d).[1] Thereafter, Bar Counsel filed an Amended Petition, asserting that, in the event that the Court determined that under the choice of law provisions set forth in Maryland Rule 8.5(b), the District of Columbia Rules of Professional Conduct ("D.C. Rules") applied to the underlying conduct, then Mr. Bonner's conduct violated D.C. Rules 8.4(a), (b), (c), and (d).

Pursuant to Maryland Rule 19-722(a) and 19-727, this Court designated the Honorable Harry C. Storm of the Circuit Court for Montgomery County ("hearing judge") to conduct a hearing regarding the alleged violations and to make findings of fact and conclusions of law. The hearing judge held an evidentiary hearing over Zoom for Government on April 26 and 27, 2021. Following the hearing, Bar Counsel withdrew the charge relating to a violation of D.C. Rule 8.4(d).

Following the hearing, the hearing judge issued written Findings of Fact and Conclusions of Law. The hearing judge applied the choice of law provisions in Maryland

---

[1] During much of the period relevant to this case, the ethical rules governing attorneys were entitled the Maryland Lawyers' Rules of Professional Conduct ("MLRPC") and were codified in an appendix to Maryland Rule 16-812. Effective July 1, 2016, the MLRPC were renamed the Maryland Attorneys' Rules of Professional Conduct ("MARPC") and recodified in Title 19 of the Maryland Rules without substantive changes. *See* Maryland Rules 19-300.1 *et seq.* We shall use the current codification of those rules in this opinion. Additionally, for readability, we will use shortened references – *i.e.*, Maryland Rule 19-301.1 will be referred to as "Maryland Rule 1.1."

2

Rule 8.5(b)[2] and determined that the D.C. Rules applied to Mr. Bonner's conduct because the "predominant effect of the conduct" occurred in the District of Columbia. The hearing judge concluded that Mr. Bonner violated D.C. Rules 8.4(a), (b), and (c). The hearing judge also made findings related to the presence of aggravating factors and mitigating factors for this Court's consideration in devising the appropriate sanction.

This Court has original and complete jurisdiction in attorney discipline proceedings and conducts an independent review of the record. *Attorney Grievance Comm'n v. Ambe*, 425 Md. 98, 122–23 (2012) (internal citations omitted). We review the hearing judge's findings of fact under the clearly erroneous standard. *Id*. When no exceptions are filed to a hearing judge's findings of fact, we accept them as established. Md. Rule 19-

---

[2] Maryland Rule 8.5(b) states:

In any exercise of the disciplinary authority of this State, the rule of professional conduct to be applied shall be as follows:

(1) for conduct in connection with a matter pending before a tribunal, the rules of the jurisdiction in which the tribunal sits, unless the rules of the tribunal provide otherwise; and

(2) for any other conduct, *the rules of the jurisdiction in which the attorney's conduct occurred, or, if the predominant effect of the conduct is in a different jurisdiction, the rules of that jurisdiction shall be applied to the conduct.* An attorney shall not be subject to the discipline if the attorney's conduct conforms to the rules of a jurisdiction in which the attorney reasonably believes the predominant effect of the attorney's conduct will occur.

(Emphasis added). The hearing judge correctly applied Maryland Rule 8.5(b) and determined that the D.C. Rules should apply to the conduct. *See Attorney Grievance Comm'n v. Tatung*, 476 Md. 45 (2021). Bar Counsel initially filed exceptions to the hearing judge's legal conclusion that the D.C. Rules applied. Prior to oral arguments in this case, Bar Counsel withdrew its exception.

3

740(b)(2)(A). Additionally, we "may confine [our] review to the findings of fact challenged by the exceptions." Md. Rule 19-740(b)(2)(B). In this case, neither party filed any exceptions to the hearing judge's findings of fact. Indeed, since the inception of Bar Counsel's investigation, Mr. Bonner has admitted to the misconduct that forms the basis of the charges. We summarize these undisputed facts below.

# I

## Facts

### *Mr. Bonner's Education and Bar Admissions*

Mr. Bonner obtained a bachelor's degree from Marquette University in 1976 and his law degree from Georgetown University Law Center in 1979. Immediately thereafter, he clerked in the Superior Court of the District of Columbia. He was admitted to the District of Columbia Bar in 1980 and to the Maryland Bar in 1990.

### *Mr. Bonner's Partnership in Bonner Kiernan Trebach & Crociata, LLP*

Throughout his career, Mr. Bonner specialized in insurance defense, working at two law firms prior to forming Bonner Kiernan Trebach & Crociata LLP ("the Firm") with three of his colleagues in 2001. Because Mr. Bonner's surname generated name recognition (largely due to his father's prominence associated with representing two government actors in the Watergate hearings), the partners decided to list Mr. Bonner's name first in the Firm's name. The Firm started with 42 attorneys, and grew to approximately 86 attorneys, including 12 equity partners, with offices in nine states. The Firm's largest office and the administrative headquarters is in D.C. The Firm primarily

represents corporations and insurance companies, focusing on defense litigation and risk management.

From the Firm's beginning and continuing to the present, Barry Trebach has functioned as the managing partner. Kevin McCarthy, CPA, is the Firm's Chief Financial and Administrative Officer. Mr. Trebach and Mr. McCarthy both testified in this matter on behalf of Bar Counsel.

Under the Firm's compensation system, the four founding partners were generally compensated equally within a compensation tier. However, after the implementation of a Compensation Committee in 2012, each equity partner had the opportunity to make a presentation on why an individual adjustment was appropriate. On an annual basis, each equity partner made a presentation to the Committee addressing the scope and status of his work, planned actions for client and business development, projections for the upcoming year, etc., and the Committee would decide whether to change that attorney's compensation.

Mr. Bonner was an important part of the Firm, and unquestionably a successful and respected attorney. He worked hard, generated substantial business, and had strong client relationships. Christopher Hassell, a former partner of Mr. Bonner's, testified that Mr. Bonner was an excellent trial lawyer who had the ability to spot strengths and weaknesses in cases.[3] According to Mr. Hassell, Mr. Bonner was also a tremendous marketer, who kept his clients well informed.

---

[3] The hearing judge noted that in 2016, Mr. Bonner was recognized by the District of Columbia Defense Lawyers Association as its "Lawyer of the Year."

5

Notwithstanding the apparent success of both Mr. Bonner and the Firm, the relationship between Mr. Bonner and some of his partners was less than harmonious. Mr. Bonner believed that certain equity partners were not making the same efforts to contribute to the success of the Firm. For example, Mr. Bonner testified that, from the inception of the Firm, he was frustrated by what he perceived to be unequal contributions by some equity partners and asserted that a couple of his partners repeatedly billed approximately one-half of the hours that were expected of them.

Mr. Bonner described feeling alienated and isolated at the Firm. He testified that he was routinely not invited to lunch or other events, or he was invited after the fact, "as a kind of joke." Mr. Bonner also recounted that, following a heart attack in June 2012, none of his partners came by to see how he was doing upon his return to the office. On another occasion, after he was injured on a client golf outing, no one came to check on him when he returned to the office. He testified that he felt like no one at the Firm cared about him. According to Dr. Sidney Binks, a clinical neuropsychologist who testified on Mr. Bonner's behalf, Mr. Bonner "felt edged out," "like there was a move afoot to take [him] out of leadership." In 2016, Mr. Bonner stepped down from the Firm's Executive Committee.

Mr. Bonner felt that he was not being appropriately compensated and deserved more money. In his mind, whether real or perceived, no one at the Firm was working the same number of hours or generating a comparable amount of business as him. Although he presented his case to the Compensation Committee for a number of years, he was kept in the same compensation tier as the other founding partners. Mr. Bonner testified that he was frustrated and angry over the manner in which some partners treated him, and in

6

particular, what he perceived to be the inequity in the compensation structure. Rather than leaving the Firm, as he acknowledged he should have done, he determined that if he "wasn't going to get paid any more[, he] would treat himself to certain things." His misconduct followed.

### *Mr. Bonner's Misconduct*

1. The 2012 Misconduct

Mr. Bonner's first acts of misconduct occurred in 2012, at a time when the Firm's equity partners had an unwritten policy that legitimate business expenses would be reimbursed by the Firm. The policy had been in effect since at least 2002. The Firm did not have a per diem for meals and travel; rather, it relied on the partners to be reasonable in their spending with the understanding that valid business expenses would be reimbursed by the Firm.

On July 23, 2012, Mr. Bonner booked flights to Bermuda for himself, his wife, and their four children. One of the Firm's primary clients, XL Catlin Insurance Company ("XL" or "XL Catlin"), maintained an office in Bermuda. On July 25, 2012, Mr. Bonner emailed XL Catlin's CEO, Michael McGavick,[4] and asked Mr. McGavick if he would be in Bermuda during the time period of Mr. Bonner's trip. Mr. McGavick replied that he would not be in Bermuda at that time.

While in Bermuda, Mr. Bonner did not perform any work or client development associated with XL Catlin and improperly charged $3,070.11 to the Firm's American

---

[4] Mr. Bonner and Mr. McGavick are also close personal friends. They are the godparents of one another's children.

7

Express credit card for his family's personal hotel and restaurant expenses. Mr. Bonner also submitted false time entries for August 15–18, 2012, which reflected eight hours of non-billable time each day with a description, "XL Group, Mike McGavick." The hearing judge determined that Mr. Bonner made knowing and intentional misrepresentations that he had engaged in client development activities in Bermuda to conceal the personal nature of his expenses for which he was seeking reimbursement.

On August 24, 2012, Mr. McCarthy asked Mr. Bonner for additional information regarding his Bermuda charges. Mr. Bonner replied in writing that, "Mike McGavick invited me to Bermuda last week. Bermuda charges are client dev. [sic] I ate a lot of charges." On September 13, 2012, Mr. Bonner emailed the Firm's equity partners with the subject line "XL Group - Status." In this email, Mr. Bonner again falsely stated that he went to Bermuda at Mr. McGavick's invitation, and summarized the trip as follows:

> I recently had the opportunity to travel to XL's beautiful offices in Bermuda @ Mike McGavick's invitation . . . Mike has invited me a number of times previously, but I decided to go this time because we didn't have a stellar beginning on our first case with them. I had struck out all summer trying to re-establish contact with Ginny Lloyd (VP Global Claims) and needed some "guidance" regarding getting back in the mix. Mike couldn't have been nicer about it and brought up all of the good things [the Firm] had done for him and his companies in the past. He said he'd talk to Jim DiV. to see what could be done. It was clear from our discussions (and there were many) that we needed to get in front of the adjusters and Ginny again. To make a long story short, I have spoken with Ginny (finally) and have reached out to some of the adjusters. I am going to meet with several on Sept 25 and actually play golf with them. While Ginny is not available, she says she will find time early next month for a face-to-face. It's almost like starting over again, but I think it's the best path.

The hearing judge determined that Mr. Bonner's email to his partners contained knowing and intentional false statements, specifically, that: his trip to Bermuda was at Mr.

8

McGavick's invitation; he visited XL's office in Bermuda; and he engaged in client development while in Bermuda. The hearing judge determined that Mr. Bonner made these false statements to conceal the personal nature of his Bermuda trip that he was attempting to improperly pass off as a business trip for reimbursement purposes.

Members of the Firm's Executive Committee investigated the Bermuda charges and discovered Mr. Bonner's July 25, 2012 email to Mr. McGavick, as well as the folio of Mr. Bonner's hotel stay, which reflected charges for two hotel rooms to the Firm's credit card. Two of the Firm's equity partners confronted Mr. Bonner about the charges. Mr. Bonner initially denied the allegations. Minutes later, he confessed, apologized, promised that the conduct would not be repeated, and offered to tender his resignation. The Firm took no official action but required that Mr. Bonner repay the $3,070.11 in trip expenses, which he repaid in full.

In response to this incident, on October 5, 2012, the Firm issued a written "Standardization of Bonner Kiernan Equity Partner Expense Policy" (the "Expense Policy"). The policy contained language confirming that the policy was not new and had been in existence since the Firm's founding. The Expense Policy included the following:

Petty Cash Expenses and Advances

All petty cash funds should be supported by original receipts, similar to any other expense reimbursement. There are times when this is not practical (i.e. small cash tips of small cash payments for services), however receipts are generally available and need to be included. For petty cash advances it is incumbent on the partner receiving an advance to substantiate the advance with actual receipts similar to any other expense reimbursement. Advances that are not substantiated within two weeks will be treated as a draw and reconciled with any true up distribution.

9

<u>American Express and Other Credit Card Charges</u>

All charges on the firm American Express card (as well as personal credit card charges where you are seeking reimbursement) need to be supported with actual receipts, and not just notes on the credit card statement. In the case of the firm American Express card these receipts should be submitted to Beth Lavilla with a description of the charge within one week of your receiving a copy of the charges on the current month's statement. For firm expenses on your personal card these receipts should be submitted with your reimbursement request.

2. <u>The 2015–2019 Misconduct</u>

In the fall of 2019, Mr. McCarthy noticed that Mr. Bonner had submitted reimbursement requests for two different activities that had taken place on the same evening. One reimbursement request was for the District of Columbia Defense Lawyers Association's ("DCDLA") annual banquet, and the other consisted of expenses incurred for an Argyle Country Club Independence Day Celebration, which Mr. Bonner attributed to "client development" with Mr. McGavick. Mr. McCarthy was suspicious of these charges and raised them with the Firm's Executive Committee. The Committee tasked Mr. McCarthy with investigating both the charges in question, as well as Mr. Bonner's other business expenses dating back to 2015.

The investigation uncovered a pattern of misconduct by Mr. Bonner beginning in 2015. Mr. McCarthy determined that Mr. Bonner had improperly submitted the Argyle Country Club charges described above, and he also identified dozens of other questionable charges, which were ultimately determined to be personal expenses that Mr. Bonner was attempting to masquerade as business expenses. The Executive Committee reviewed Mr. McCarthy's findings and presented them to the equity partners.

On November 4, 2019, Mr. McCarthy, along with two of the Firm's equity partners, John Kiernan and Alan Block, confronted Mr. Bonner with the findings of the investigation. Mr. Kiernan advised Mr. Bonner that he could resign or face expulsion at a meeting scheduled for the following week. Mr. Bonner pleaded with Messrs. Kiernan and Block to reconsider his expulsion without success. Mr. Bonner was given a notice barring him from the Firm's premises and was escorted from the office.

Mr. Bonner retired from the Firm effective November 9, 2019. In March 2020, Mr. Bonner and the Firm finalized the details surrounding his retirement. Through an offset of his capital account balance, he paid the Firm the sum of $35,000, which the Firm agreed "constitute[d] full restitution by Bonner for any allegedly improper expenses, including the costs of the investigations related thereto."

### The Firm's Disciplinary Complaint Against Mr. Bonner

The Firm filed a complaint with the D.C. Office of Disciplinary Counsel and with the Commission. As it pertains to the charges in the Petition filed by the Commission, the Firm's complaint included the $3,070.11 charge from Mr. Bonner's 2012 Bermuda trip, and over $20,000 that the Firm contended Mr. Bonner improperly charged from 2015–2019. Mr. Bonner cooperated with the investigation, responded to the complaint, and provided substantial detail regarding the allegations. On March 24, 2020, Mr. Bonner submitted a lengthy narrative response to Bar Counsel. Although Mr. Bonner contended that some of expenses identified in the complaint were proper business expenses, he acknowledged that much of the conduct identified in the complaint violated his ethical obligations. He also conveyed remorse.

11

***Summary of Improper Expenses and Misconduct Related Thereto***

The hearing judge found "that Mr. Bonner engaged in a pattern of misconduct that involved expensing personal items" to the Firm and by "making a variety of false statements to cover up the true nature of those expenses by characterizing them as client development." The hearing judge determined that "[h]e engaged in this behavior once in 2012 and on approximately 35 occasions between 2015 and 2019. In doing so, [Mr. Bonner] improperly expensed $3,070.11 in 2012 and $11,184.84 [between 2015 and 2019], for a total of $14,254.95." The hearing judge summarized the improper charges submitted during the 2015–2019 time period as follows.

1. Improper Country Club Expenses.

The hearing judge found that Mr. Bonner submitted "illegitimate charges" related to the Argyle Country Club, on four days in 2018 and 2019, totaling $639.86. In each instance, the charges were for personal use, and Mr. Bonner, through notations on reimbursement requests, knowingly and intentionally mispresented that they were for "client development."

2. Improper Personal Charges to the Firm's Credit Card (Without Any Explanation by Mr. Bonner)

The hearing judge found that between 2015–2019, Mr. Bonner knowingly and intentionally charged personal expenses to the Firm's credit card for meals at D.C. restaurants on 13 occasions without any explanation, totaling $1,449.68.

3. Improper Personal Charges to the Firm's Credit Card (With Accompanying Knowing and Intentional Misrepresentations)

On 14 occasions, Mr. Bonner improperly charged personal expenses to the Firm's American Express credit card, totaling $7,967.30, and in doing so, made knowing and intentional misrepresentations about the nature of the charges. With respect to these charges, the hearing judge found that "on numerous occasions," Mr. Bonner made intentional misrepresentations "to cover up that the expenses were actually personal in nature." These misrepresentations included handwritten notes on credit card statements and receipts falsely attributing expenses to "client development." For some charges, Mr. Bonner created false calendar entries and false time entries in a further effort to conceal the improper nature of the charges. For example, Mr. Bonner took his wife to see the Broadway musical, "Hamilton" in New York City between September 13–14, 2016, and improperly charged $1,156.82 to the Firm's credit card for transportation, meals, and hotel expenses. To conceal the improper nature of these charges, Mr. Bonner created false calendar entries for those dates indicating that he was scheduled to engage in client development activities in New York City with two different clients from 8:00 a.m. through 6:00 p.m. each day. He also submitted false time entries for those dates.[5]

Mr. Bonner also charged similar improper personal expenses, making similar knowing and intentional misrepresentations (through false calendar entries and false time

---

[5] In Mr. Bonner's false time entries for September 13–14, 2016, Mr. Bonner misrepresented that he spent 4 hours of travel time to New York City "for client meetings"; 1 hour of client development with "QBE"; 4.5 hours of client development for "meeting and lunch" with "XL Carlin [sic] in New York City"; and 10 hours of client development time with "Berkley and AIG", and return travel to Washington, D.C.

entries) associated with a family trip to San Francisco in March 2017,[6] a vacation in Nashville in September 2017,[7] a trip to see a Broadway show in New York City in September 2018,[8] a trip to Boston and Maine in July 2019,[9] as well as several personal meals at D.C. restaurants. In connection with trips to San Francisco and Nashville, Mr. Bonner sent emails to the Firm's equity partners describing client development activities and meetings that never happened. With respect to the restaurant expenses, Mr. Bonner knowingly and intentionally misrepresented that the personal expenses were associated with "client development" on the credit card statements and/or receipts. Some of the

---

[6] In connection with the family vacation in San Francisco, in addition to creating false calendar entries and false time entries, Mr. Bonner sent an email to the Firm's equity partners in which he knowingly and intentionally misrepresented that he had engaged in client development activities during his trip, describing a meeting that never happened.

[7] The primary purpose of the vacation was for the Bonners to see one of their daughters perform at the Grand Ole Opry. While in Nashville, Mr. Bonner stopped by the office of one of his clients for approximately one hour and dropped off a box of donuts. He did not engage in any other client development while in Nashville, and improperly charged $1,638.66 to the Firm's credit card for airfare, car rental, meals, and hotel expenses. Similarly, he submitted false time entries for client development, including "meetings" and "dinner." He followed up with an email to the Firm's equity partners on September 25, 2017, in which he knowingly and intentionally mispresented that he engaged in client development activities during his Nashville trip, describing in detail client development and meetings that did not happen.

[8] Mr. Bonner improperly charged the Firm credit card $1,949.90 for train tickets, meals, hotel, parking, and transportation expenses. Like the other expenses, Mr. Bonner created false calendar entries and false time sheets to conceal the improper nature of these charges, misrepresenting that he spent 4.5 hours traveling to New York for "meeting with AIG, Berkley, XL and Zurich," 3 hours of client development and meetings with XL, and 8 hours of client development meetings and lunch with AIG.

[9] The hearing judge found that Mr. Bonner traveled to Boston, where he met with partners at the Firm's Boston office for a few hours, and then continued to Maine for a vacation with his wife. The hearing judge determined that Mr. Bonner improperly charged $742.07 to the Firm's credit card for airfare, meals, and hotel expenses.

14

restaurant expenses were accompanied by false calendar entries indicating that he was having meals with clients.

### 4. Misappropriation of Amtrak Vouchers

On three occasions between 2018 and 2019, Mr. Bonner improperly used vouchers totaling $878.00 issued by Amtrak for cancelled tickets previously charged to the Firm's credit card for personal travel by his daughters, his wife, and himself.

### 5. Misappropriation of Petty Cash

Between 2015 and 2019, Mr. Bonner received petty cash advances from the Firm totaling $5,770. Mr. Bonner admits that he improperly used the Firm's petty cash on four occasions, totaling $250. On those occasions, he withdrew petty cash for trips that he anticipated would involve client development but on which he spent little or no client development time. Mr. Bonner never returned the funds to the Firm, which he admitted was improper. Other than the $250 described above, the hearing judge determined that there was no evidence that Mr. Bonner improperly spent other petty cash advances or had a general practice of doing so.[10]

---

[10] The hearing judge accepted Mr. Bonner's testimony that he routinely used petty cash for incidentals such as tipping volunteers at the Firm's annual golf outings, waitstaff at the Firm's annual holiday parties, and hotel staff while traveling. Mr. Bonner provided records and details corroborating these instances, which were also confirmed by Mr. Hassell. Although the hearing judge determined that these expenses were not improper, he nonetheless determined that "[t]he record establishes that Mr. Bonner did not provide receipts substantiating his petty cash expenditures and that this violated the Firm's internal policy."

15

**Conclusions of Law**

The hearing judge determined that Mr. Bonner violated D.C. Rule 8.4(a), (b), and (c). We conduct a de novo review of the hearing judge's conclusions of law. Md. Rule 19-740(b)(1). Neither party filed exceptions to the hearing judge's conclusions of law. Based upon our independent review of the record, we agree with the hearing judge's conclusions that Bar Counsel established a violation of these rules by clear and convincing evidence.

*D.C. Rule 8.4(a)*

D.C. Rule 8.4(a) provides: "It is professional misconduct for a lawyer to: (a) [v]iolate or attempt to violate the Rules of Professional Conduct[.]" As discussed below, because we determine that Mr. Bonner violated D.C. Rule 8.4(b) and (c), we conclude that he also violated D.C. Rule 8.4(a).

*D.C. Rule 8.4(b)*

D.C. Rule 8.4(b) provides: "It is professional misconduct for a lawyer to: (b) [c]ommit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects[.]" The hearing judge concluded that, between 2012 and 2019, Mr. Bonner engaged in a "pattern of misconduct" in which he "intentionally misappropriated more than $14,000 from the Firm in about 35 separate transactions." The hearing judge determined that "Mr. Bonner used deception and false pretenses—conduct amounting to theft[11] despite the absence of criminal charges—by misrepresenting either

---

[11] The District of Columbia Theft statute is found at D.C. Code § 22-3211 and provides:

16

directly, or by omission, that charges and expenses were legitimate business expenses." Based upon our independent review of the record, we agree with the hearing judge's conclusion.

### D.C. Rule 8.4(c)

D.C. Rule 8.4(c) provides: "It is professional misconduct for a lawyer to: (c) [e]ngage in conduct involving dishonesty, fraud, deceit, or misrepresentation[.]" We agree with the hearing judge's conclusion that Mr. Bonner violated D.C. Rule 8.4(c) through his actions taken in an effort to conceal the personal nature of expenses that he submitted to the Firm for reimbursement, including: falsely reporting "client development" time through entries on expenses receipts and statements and by falsely creating calendar entries and time entries identifying time spent with clients. The hearing judge correctly determined that each false and dishonest statement made in connection with these personal expenses constituted a violation of D.C. Rule 8.4(c).

---

(a) For the purpose of this section, the term "wrongfully obtains or uses" means: (1) taking or exercising control over property; (2) making an unauthorized use, disposition, or transfer of an interest in or possession of property; or (3) obtaining property by trick, false pretense, false token, tampering, or deception. The term "wrongfully obtains or uses" includes conduct previously known as larceny, larceny by trick, larceny by trust, embezzlement, and false pretenses.

(b) A person commits the offense of theft if that person wrongfully obtains or uses the property of another with intent:

(1) To deprive the other of a right to the property or a benefit of the property; or

(2) To appropriate the property to his or her own use or to the use of a third person.

17

**Legal Questions Involving the Choice of Law Provisions
(Maryland Rule 8.5(b))**

As noted above, neither party filed exceptions to the findings of fact or conclusions of law as found by the hearing judge and summarized above. The key dispute in this case involves the appropriate sanction that this Court should impose for Mr. Bonner's admitted misconduct. Before we turn to sanctions, we address two legal issues raised in this case that pertain to the hearing judge's application of the D.C. Rules to Mr. Bonner's misconduct, one of which is raised by Bar Counsel in the form of exceptions, and the other of which is asserted by Mr. Bonner in connection with his sanction argument. We address Bar Counsel's exception first.

1. <u>Bar Counsel's Exception to the Hearing Judge's Failure to Apply *Both* the D.C. Rules and the Maryland Rules to the Same Underlying Misconduct Under Rule 8.5(b)</u>

As noted above, Bar Counsel initially charged Mr. Bonner with violating Maryland Rule 8.4 (a)–(d). Bar Counsel subsequently amended its petition by charging Mr. Bonner with violating D.C. Rule 8.4(a)–(d), *as an alternative* to the charges filed under the corresponding Maryland Rule, in the event that this Court determined that the D.C. Rules applied under the choice of law provisions of Maryland Rule 8.5(b).

Based upon charges filed, the hearing judge correctly applied Maryland Rule 8.5(b) and determined that, because the predominant effect of Mr. Bonner's misconduct occurred in the District of Columbia, the D.C. Rules should apply to the underlying conduct. The hearing judge proceeded to make conclusions of law pertaining only to the D.C. Rules, and

found violations of D.C. Rule 8.4 (a), (b), and (c). The hearing judge did not make any legal conclusions pertaining to D.C. Rule 8.4(d) because Bar Counsel dismissed that charge. Nor did the hearing judge make conclusions pertaining to the corresponding Maryland Rule for the same underlying misconduct.

Although Bar Counsel initially excepted to the hearing judge's application of the D.C. Rules to the underlying conduct, Bar Counsel withdrew its exception, presumably based upon our decision in *Attorney Grievance Commission v. Tatung*, 476 Md. 45, 74 (2021). Notwithstanding the fact that Bar Counsel is no longer excepting to the application of the D.C. Rules, Bar Counsel nonetheless asserts that the hearing judge erred in failing to make legal conclusions under *both* the Maryland Rules *and* the D.C. Rules that were pleaded in the alternative, which pertain to the same underlying misconduct. We overrule Bar Counsel's exceptions for the reasons set forth herein.

We recently described the genesis of Maryland's choice of law rule that applies to allegations of an attorney's professional misconduct—Maryland Rule 8.5(b)—in *Tatung*. 476 Md. at 74. It was added by a rules order of this Court in February 2005 in light of changes that were made in 2000 to the ABA Model Rules. *Id*. Maryland Rule 8.5(b) "establishes the set of professional conduct rules that apply when an attorney practices in more than one jurisdiction—either by virtue of their physical presence or contacts with a particular jurisdiction, or their license to practice in more than one jurisdiction." *Id.* at 77.

Maryland Rule 8.5(b) states:

In any exercise of the disciplinary authority of this State, *the rule of professional conduct to be applied* shall be as follows:

(1) for conduct in connection with a matter pending before a tribunal, the rules of the jurisdiction in which the tribunal sits, unless the rules of the tribunal provide otherwise; and

(2) *for any other conduct, the rules of the jurisdiction in which the attorney's conduct occurred, or, if the predominant effect of the conduct is in a different jurisdiction, the rules of that jurisdiction shall be applied to the conduct.* An attorney shall not be subject to the discipline if the attorney's conduct conforms to the rules of a jurisdiction in which the attorney reasonably believes the predominant effect of the attorney's conduct will occur.

(Emphasis added). Under the plain language of the rule, the rule specifically contemplates that *one set of professional rules* should apply to a particular act or acts of conduct. The reasons for the Rule are described in the comments.[12] Comment 2 explains that "[a]n attorney may be potentially subject to more than one set of rules of professional conduct that impose different obligations." Maryland Rule 8.5, cmt. 2. The choice of law provisions established by Rule 8.5(b) recognize that "[t]he attorney may be licensed to practice in more than one jurisdiction with differing rules, or may be admitted to practice before a particular court with rules that differ from those of the jurisdiction or jurisdictions in which the attorney is licensed to practice. Additionally, the attorney's conduct may involve significant contacts with more than one jurisdiction." *Id.*

Comment 3 explains that subsection (b) "seeks to resolve such potential conflicts" in the professional conduct rules between the jurisdictions based upon the "premise . . . that minimizing conflicts between rules, as well as uncertainty about which rules are applicable,

---

[12] As we pointed out in *Attorney Grievance Comm'n v. Tatung*, 476 Md. 45, 75 (2021), our Rule 8.5(b) and our comments to our rule are "substantially similar" to ABA Model Rule 8.5(b), as well as the ABA comments to that rule.

is in the best interest of both clients and the profession (as well as the bodies having authority to regulate the profession)." Accordingly, subsection (b)

> takes the approach of (i) providing that any particular conduct of an attorney *shall be subject to only one set of rules of professional conduct*, (ii) *making the determination of which set of rules applies to particular conduct as straightforward as possible*, consistent with recognition of appropriate regulatory interests of relevant jurisdictions, and (iii) providing protection from discipline for attorneys who act reasonably in the face of uncertainty.

Maryland Rule 8.5, cmt. 3 (emphasis added). The overarching principle behind Maryland Rule 8.5(b) is to ensure the *consistent application of one set of ethics rules* where the misconduct is potentially subject to two sets of rules. To that end, comment 6 states:

> If two admitting jurisdictions were to proceed against attorney [sic] for the same conduct, they should, applying this Rule, identify the same governing ethics rules. They should take all appropriate steps to see that they do apply the same rule to the same conduct, and in all events should avoid proceeding against an attorney on the basis of two inconsistent rules.

In this case, it was appropriate for Bar Counsel to file charges under the D.C. Rules, and for the hearing judge to apply the same, given that the predominant effect of Mr. Bonner's misconduct occurred in the District of Columbia. However, given Bar Counsel's filing of charges under the D.C. Rules (albeit pleaded "in the alternative" to the Maryland Rules), and the hearing judge's correct application of those rules, it was unnecessary for the hearing judge to also render legal conclusions under the corresponding Maryland Rule based upon the same underlying misconduct. The comments to the Rules expressly contemplate that only *one set of ethics rules will apply to particular acts of misconduct.* Where particular misconduct is identified and charged, the conduct should be subject to the application of only one set of professional rules. To hold otherwise would be to create

21

situations where more than two sets of rules apply to the same discrete acts of misconduct, and with potentially inconsistent results, particularly where the professional rules are not identical. Indeed, the charges filed "in the alternative" by Bar Counsel in this case—under D.C. Rule 8.4(d) and Maryland Rule 8.4(d)—highlight this very point. Maryland Rule 8.4(d) appears to be a watered-down version of D.C. Rule 8.4(d). *Compare* Maryland Rule 8.4(d) ("[i]t is professional misconduct for an attorney to: [] engage in conduct that is *prejudicial to the administration of justice*[]") *with* D.C. Rule 8.4(d) ("[i]t is professional misconduct for a lawyer to: [] engage in conduct that *seriously interferes with the administration of justice*[]"). (Emphasis added). Bar Counsel withdrew its charge under D.C. Rule 8.4(d) presumably because it is not identical to Maryland Rule 8.4(d) as far as the nature and degree of misconduct required to prove a violation. Having withdrawn the charge under D.C. Rule 8.4(d), Bar Counsel asserts that the hearing judge erred by failing to render legal conclusions concerning Maryland Rule 8.4(d). To permit Bar Counsel to charge, and a hearing judge to apply, in a mix and match fashion, *two sets* of professional rules to the *same acts of misconduct* is inconsistent with the plain language and purpose of Maryland Rule 8.5(b)—which is to apply *one set* of professional rules to particular misconduct.[13] Having correctly determined that the D.C. Rules applied to Mr. Bonner's

---

[13] In support of its argument that the hearing judge erred in failing to make legal conclusions pertaining to the violations of the Maryland Rules, Bar Counsel cites to Maryland Rule 19-727(e), which provides that the hearing judge is required to "prepare and file a written statement which shall contain [] findings of fact and conclusion of law as to each charge." Although Bar Counsel correctly cites to the legal rule concerning the hearing judge's obligation, that rule must be read consistently with the choice of law provisions contained in Maryland Rule 8.5(b), which requires that one set of professional rules apply to the misconduct alleged. It would be inconsistent with the plain language of

22

acts of misconduct, the hearing judge did not err in failing to make conclusions of law pertaining to the same acts of misconduct under the corresponding Maryland Rules.

2. Mr. Bonner's Legal Argument that this Court Should Apply D.C. Sanctions Jurisprudence

We next turn to Mr. Bonner's legal argument that arises from the application of the choice of law provisions set forth in Maryland Rule 8.5(b). Mr. Bonner argues that, because the D.C. Rules applied to the misconduct, this Court should similarly apply the District of Columbia's case law when fashioning an appropriate sanction. Although Mr. Bonner admits that there is no case law that supports his position,[14] he directs us to Maryland Rule 8.5(b) and points out that the express goal of the choice of law rules is to "ensure a single set of applicable rules, minimizing uncertainty for both courts and attorneys and providing the latter with sufficient notice of their ethics obligations." According to Mr. Bonner, "it makes little sense to apply a foreign jurisdiction's rules on

---

the choice of law provisions contained in Maryland Rule 8.5(b) for the hearing judge to apply the D.C. Rules and the Maryland Rules to the same underlying misconduct. To be sure, if a petition involves charges involving *separate acts of misconduct*, each separate act of misconduct may involve the application of a separate set of professional rules. For example, in *Tatung*, we applied the federal professional immigration rules to the attorney's conduct arising from his representation of clients in federal immigration proceedings and applied the Maryland Rules to *separate allegations of misconduct* arising from the disciplinary proceeding itself. *See Tatung*, 476 Md. at 92–93. It was appropriate in *Tatung* to apply the Maryland Rules to the separate acts of alleged misconduct related to the Maryland disciplinary proceeding. In disciplinary matters arising under Maryland Rule 8.5(b), Bar Counsel should identify the discrete act or acts of misconduct and apply *one set of professional rules* to the particular act or acts of misconduct.

[14] At oral argument, in response to questions from the Court concerning whether Maryland Rule 8.5(b) requires the Court to apply another jurisdiction's sanctions jurisprudence, counsel for Mr. Bonner admitted that "we haven't found any cases that squarely address this question in Maryland or elsewhere."

23

liability, only to then revert to Maryland's rules on sanction." For the reasons outlined below, we disagree with Mr. Bonner's analysis of Maryland Rule 8.5(b). We do not find any support for his argument in the plain language of the rule or our case law.

Although the Commission correctly charged Mr. Bonner under the D.C. Rules, and the hearing judge correctly applied them, it does not follow that we apply the sanctions jurisprudence of the District of Columbia. The plain language of Maryland Rule 8.5(b) specifically addresses the "rule of professional conduct to be applied" when the conduct in question may be subject to more than one set of professional rules. The rules of conduct identify the conduct that is and is not permitted. Once a rule violation is found to have occurred, we consider the imposition of sanctions based upon the aggravating and mitigating factors proven and our case law. The professional rules do not address sanctions, rather, that body of law has been developed and applied through our case law. There is nothing in the plain language of Maryland Rule 8.5, its comments, or our case law, that requires or even hints at a suggestion that we would apply the District of Columbia's sanction jurisprudence when devising the appropriate sanction for the misconduct. And as we explain below, there is good reason for the absence of such a suggestion.

*This Court's Original Jurisdiction and Duty to Uphold the*
*Purpose of Maryland Sanctions*

"The Court of Appeals has original jurisdiction over attorney discipline matters." *Attorney Grievance Comm'n v. Thomas*, 440 Md. 523, 544 (2014). Although we "refer petitions for disciplinary actions to a circuit court judge to act as our hearing officer, for

that judge to receive evidence and thereafter present to the Court findings of fact and recommended conclusions of law," this Court retains complete jurisdiction over the matter, including the sanction to be imposed. *Id.* at 545.

In Maryland, the "chief purpose of the sanction is to protect the public." *Id.* at 556. We have explained that it is our *duty* to ensure that the purpose underlying the imposition of sanctions is properly served. *Attorney Grievance Comm'n v. Weiss*, 389 Md. 531, 548 (2005). In upholding that duty,

> we have recognized that the public interest is served when this Court imposes a sanction which demonstrates to members of the legal profession the type of conduct that will not be tolerated. Moreover, such a sanction represents the fulfillment by this Court of its responsibility to insist upon the maintenance of the integrity of the bar and to prevent the transgression of an individual lawyer from bringing its image into disrepute. Therefore, the public interest is served when sanctions designed to effect general and specific deterrence are imposed on an attorney who violates the disciplinary rules.

*Id.* at 548 (cleaned up). Our duty with respect to upholding the purpose underlying the imposition of sanctions is paramount and is reflected in our approach to sanctions in reciprocal discipline cases. Although this is not a reciprocal discipline case (and therefore, in our view, we have even *less justification* to apply the sanctions jurisprudence of another jurisdiction), our approach to sanctions in such cases illustrates the importance that we place on the independent exercise of our duty.

In reciprocal discipline cases, "we have held that, *ordinarily*, when the purpose for the discipline in the original jurisdiction is congruent with ours, we follow the original jurisdiction's sanction." *Id.* at 547 (emphasis in original). In *Weiss*, we noted that:

25

> "When the Court considers the appropriate sanction in a case of reciprocal discipline, we look not only to the sanction imposed by the other jurisdiction but to our own cases as well. The sanction will depend on the unique facts and circumstances of each case, but with a view toward consistent dispositions for similar misconduct."

*Id.* at 548 (quoting *Attorney Grievance Comm'n v. Parsons*, 310 Md. 132, 142 (1987)).

We observed that "[t]his standard is in agreement with our duty to protect the public, gives appropriate deference to our sister jurisdictions and ensures that every member of the Maryland Bar is subject to the same sanctions for similar conduct." *Id.* at 548. We noted that "[i]n reciprocal discipline cases where we impose the original jurisdiction's sanction, we usually find that the same discipline would be given in Maryland." *Id.* at 549. After conducting a survey of some reciprocal discipline cases, we pointed out that, "[a]s these cases illustrate, although we usually do not deviate from the original jurisdiction's sanction, we will do so when the conduct involved is of such nature that it would not be tolerated from any member of the Bar in this State if the conduct occurred here." *Id.* at 552.

Our professional rules governing reciprocal discipline incorporate the potentially competing objectives of giving deference to a sister jurisdiction, but also ensuring that members of the Maryland Bar are subject to the same sanctions for similar conduct. *See* Md. Rule 19-737(e) ("Reciprocal discipline shall not be ordered if Bar Counsel or the attorney demonstrates by clear and convincing evidence that . . . (4) the conduct established . . . warrants substantially different discipline in this State."). When we have determined that the sanction imposed in the original jurisdiction was not in line with our sanction jurisprudence, we have not hesitated to impose a greater sanction. *See*, *e.g.*, *Attorney Grievance Comm'n v. Vanderslice*, 435 Md. 295 (2013) (declining to impose reciprocal

26

discipline of a one-year suspension, in favor of disbarment, for an attorney who misappropriated funds from the law firm, in which he was a partner, on eight separate occasions over a ten-month span, totaling $1,780); *Attorney Grievance Comm'n v. Zodrow*, 419 Md. 286, 302 (2011) (determining that disbarment was the proper sanction in a reciprocal action, even though the Colorado Supreme Court only imposed a one year and one day suspension, because the "purpose of [Md. Rule 19-737(e)] is to ensure that all attorneys of this Bar are subject to similar sanctions for similar misconduct, regardless of whether the misconduct takes place in this State or another jurisdiction[]").

Here, we are not imposing reciprocal discipline. Rather, we are exercising our original jurisdiction pursuant to charges filed by the Commission and imposing a sanction based upon findings of fact and legal conclusions made by the hearing judge appointed by this Court. The hearing judge correctly applied D.C. Rule 8.4 (a), (b), and (c) to the underlying conduct, which ensures the uniform application of charges consistent with the purpose and objective of Maryland Rule 8.5(b). However, nothing in our rules or our case law suggests that we would apply the sanctions jurisprudence of another jurisdiction when considering the appropriate sanction to impose upon Mr. Bonner, who is an attorney licensed in this State.

We also observe that, when other states have applied the professional rules of another state in disciplinary proceedings pursuant to their choice of law rules that are similar or identical to ABA Model Rule 8.5(b), the state applied its *own* case law when considering the appropriate sanction. *See*, *e.g.*, *In re Vega*, 241 So.3d 993 (La. 2018) (Louisiana Supreme Court applying Texas ethics rules where the Louisiana lawyer's

conduct occurred in Texas, but discussing Louisiana case law in connection with the imposition of the sanction of disbarment); *In re Lyons*, 780 N.W.2d 629 (Minn. 2010) (Minnesota disciplinary proceeding applying Montana ethics rules to misconduct in connection with federal litigation in Montana, but applying Minnesota case law in connection with aggravating and mitigating circumstances and the imposition of sanctions); *In re Overboe*, 745 N.W.2d 852 (Minn. 2008) (Minnesota Supreme Court applying North Dakota ethics rules for violations involving a trust account where the attorney practiced and had bank accounts, but applying Minnesota case law in connection with the imposition of the sanction); *In re Ponds*, 888 A.2d 234 (D.C. 2005) (District of Columbia disciplinary proceeding applying the Maryland professional rules of conduct where the attorney's misconduct occurred in a Maryland case, but applying District of Columbia case law in determining the appropriate sanction).

We will not apply the case law of another jurisdiction when imposing a sanction for misconduct by a Maryland attorney. Such a notion is inconsistent with our paramount duty to protect the public when considering a sanction and could lead to less-than-uniform sanctions being imposed on Maryland attorneys who engage in similar misconduct. In other words, we will not impose a less severe sanction upon a Maryland attorney simply because the attorney engaged in a pattern of deceit and misappropriation in the District of Columbia instead of in Maryland.

Having determined that we will apply our case law where the choice of law provisions of Maryland Rule 8.5(b) require the application the professional rules of another jurisdiction, we address the appropriate sanction for Mr. Bonner's misconduct in this case.

28

## Sanction

Turning to sanctions, Bar Counsel recommends that Mr. Bonner be disbarred, citing to our well-established principle that disbarment is warranted where the attorney engages in intentional misconduct involving misappropriation of funds. Mr. Bonner asserts that, given the significant mitigating factors that the hearing judge found in this case, he should be suspended. Assuming that we reject Mr. Bonner's argument that this Court should apply District of Columbia case law when determining the appropriate sanction,[15] Mr. Bonner suggests that under Maryland case law, an indefinite suspension with the right to reapply for reinstatement after one year is consistent with the sanctions that we have imposed in similar cases.

We have previously commented that "determining the appropriate sanction requires this Court to consider the facts and circumstances of each particular case, including consideration of any mitigating factors." *Attorney Grievance Comm'n v. Miller*, 467 Md. 176, 223 (2020) (internal quotations omitted). "It is well-established that the purpose of sanctions is not to punish the attorney." *Attorney Grievance Comm'n v. Keating*, 471 Md. 614, 651 (2020). "Sanctions are also designed to effect general and specific deterrence." *Attorney Grievance Comm'n v. Shapiro*, 441 Md. 367, 395 (2015). "Our guiding principle

---

[15] In his written pleadings and oral arguments before this Court, Mr. Bonner relied upon disciplinary cases from the District of Columbia to support a suspension ranging from 60 days to six months. Given that we have determined that it is appropriate to apply our case law, we will not consider whether the District of Columbia Court would impose a less severe sanction.

in determining sanctions for ethical violations is our interest in protecting the public and the public's confidence in the legal profession." *Attorney Grievance Comm'n v. McDonald*, 437 Md. 1, 45 (2014) (internal citation omitted). "We look not to the number of rules broken, but to the lawyer's conduct." *Thomas*, 440 Md. at 556. Or stated otherwise, when deciding the proper sanction for an errant attorney's conduct, "we do not simply tote up the number of possible violations and aggravating factors to arrive at an appropriate sanction." *Attorney Grievance Comm'n v. Ndi*, 459 Md. 42, 65 (2018). As we always do, we consider the aggravating and mitigating factors found by the hearing judge and address any exceptions thereto.

### *Aggravating Factors*

"Aggravating factors are essentially the antithesis of mitigating factors and militate in favor of a more severe sanction." *Miller*, 467 Md. at 233 (internal quotations omitted). When fashioning a sanction, we consult the aggravating factors articulated in Standard 9.22 of the ABA Standards for Imposing Sanctions.[16]

---

[16] We have recognized the following aggravating factors when considering the imposition of sanctions:

> (1) prior attorney discipline; (2) a dishonest or selfish motive; (3) a pattern of misconduct; (4) multiple violations of the [MARPC]; (5) bad faith obstruction of the attorney discipline proceeding by intentionally failing to comply with the Maryland Rules or orders of this Court or the hearing judge; (6) submission of false evidence, false statements, or other deceptive practices during the attorney discipline proceeding; (7) a refusal to acknowledge the misconduct's wrongful nature; (8) the victim's vulnerability; (9) substantial experience in the practice of law; (10) indifference to making restitution or rectifying the misconduct's consequences; (11) illegal conduct, including that involving the use of controlled substances; and (12) likelihood of repetition of the misconduct.

The hearing judge found four aggravating factors that applied to Mr. Bonner's conduct: (i) dishonest or selfish motive; (ii) pattern of misconduct; (iii) illegal conduct; and (iv) substantial experience in the practice of law. Bar Counsel has not excepted to any of the hearing judge's conclusions concerning aggravating factors. Mr. Bonner excepts to the hearing judge's conclusion with respect to one aggravating factor—his substantial experience in the practice of law. Concerning this factor, the hearing judge noted that "Mr. Bonner practiced civil litigation, including insurance defense work, for nearly 40 years." Mr. Bonner asserts that the hearing judge erred in finding this aggravating factor because he contends that this Court only considers substantial experience in the law as an aggravating factor when the misconduct pertains to the practice of law. We disagree with Mr. Bonner on this point and overrule his exception. As a seasoned lawyer in the Firm that Mr. Bonner helped establish, he knew that misappropriating funds for personal use and creating a false paper trail of emails, false time and calendar entries, and notations on receipts was wrong. After his misappropriation of funds was discovered in 2012 in connection with the Bermuda trip, he resumed his misconduct in 2015, which lasted until it was discovered was once again in 2019. That Mr. Bonner stole from and lied to his partners in connection with the practice of law, as opposed to clients, is of no moment. We decline to carve out an exception to the presence of this aggravating factor because Mr. Bonner's misconduct involved deceit and misappropriation that affected his law partners

---

*Attorney Grievance Comm'n v. Sperling*, 459 Md. 194, 275 (2018) (citation omitted).

31

instead of clients. *See*, *e.g.*, *Attorney Grievance Comm'n v. Levin*, 438 Md. 211 (2014) (upholding substantial experience in the law as an aggravating factor where the attorney violated Maryland Rule 8.4 (a), (b), (c) and (d) by misrepresenting his caseload to his law firm and creating fictitious clients and paperwork in an effort to obtain more money from the firm than he was otherwise entitled to receive).

### *Mitigating Factors*

In attorney grievance proceedings, this Court considers several mitigating factors based upon ABA Standard 9.32.[17] The hearing judge found the following eight mitigating factors in this case: no prior discipline; imposition of other penalties/sanctions or significant consequences; restitution; cooperation with and disclosure to Bar Counsel;

---

[17] This Court has recognized the following mitigating factors when considering the imposition of sanctions:

> (1) the absence of prior attorney discipline; (2) the absence of a dishonest or selfish motive; (3) personal or emotional problems; (4) timely good faith efforts to make restitution or to rectify the misconduct's consequences; (5) full and free disclosure to the Commission or a cooperative attitude toward the attorney discipline proceeding; (6) inexperience in the practice of law; (7) character or reputation; (8) a physical disability; (9) a mental disability or chemical dependency, including alcoholism or drug abuse, where: (a) there is medical evidence that the lawyer is affected by a chemical dependency or mental disability, (b) the chemical dependency or mental disability caused the misconduct, (c) the lawyer's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation, and (d) the recovery arrested the misconduct, and the misconduct's recurrence is unlikely; (10) delay in the attorney discipline proceeding; (11) the imposition of other penalties or sanctions; (12) remorse; (13) remoteness of prior violations of the [MARPC]; and (14) unlikelihood of repetition of the misconduct.

*Sperling*, 459 Md. at 277–78 (citation omitted).

character or reputation; remorse; unlikelihood of repetition; and emotional problems. Bar Counsel excepts to five of these eight factors: imposition of other penalties or sanctions; timely good faith efforts to make restitution; remorse; and personal or emotional problems. We address Bar Counsel's exceptions as we consider each factor.

1. No Prior Discipline

It is undisputed that, over the course of his nearly 40-year legal career, Mr. Bonner was never the subject of attorney discipline and has never been sanctioned by a court.

2. Imposition of Other Penalties/Sanctions or Significant Consequences

The hearing judge found that Mr. Bonner had proven the "imposition of other penalties/sanctions or significant consequences." The hearing judge explained that Mr. Bonner's "reputation has been tarnished; he is unemployed; he has lost his ownership interest in the Firm which bore his name and which he co-founded; and he will face disciplinary consequences in the District of Columbia." In its exceptions, Bar Counsel asserts that the "facts as found by the hearing judge are not recognized mitigation but are merely the natural consequences of [Mr. Bonner's] scheme to defraud his law partners and law firm over a period of years." We agree with Bar Counsel and sustain the exception to the presence of this mitigating factor.

In *Attorney Grievance Commission v. Spery*, 371 Md. 560 (2002), we determined that an attorney's misappropriation of funds from a real estate partnership warranted disbarment. In arguing for a lesser sanction, the respondent urged us to consider, as a mitigating factor, the fact that his partners undertook an illegal blackmail scheme to recover the funds. *Id*. at 571. The respondent argued that these "exorbitant payments" exacted by

blackmail constituted the "imposition of other penalties or sanctions" under ABA Standard 9.32(k). We noted that we "have not had an occasion to discuss the application of this factor" and observed that, in jurisdictions that had considered it, courts had limited its application to circumstances where the "sanctions were disciplinary or punishment in nature." *Id.* (citations omitted). We rejected the respondent's argument, concluding that the financial ramifications of the partners' separate misconduct did not constitute a mitigating factor in the attorney's disciplinary case for misappropriation. In *Levin*, 438 Md. at 221–22, we rejected respondent's argument that his embarrassment and fear for his reputation should be considered as mitigation where the respondent misrepresented his caseload and created fictitious clients and paperwork in order to receive more money from his law firm.

We similarly reject consideration of these types of facts as mitigation here. In many instances, an attorney's misconduct—particularly where theft and deceit are involved—is certain to cause significant, natural consequences beyond those related to the disciplinary proceeding. Indeed, it is often the case that more egregious misconduct leads to more serious consequences, such as the termination of employment or loss of a reputation. We will not recognize the natural consequences of intentional misconduct as constituting a mitigating factor that would militate against the imposition of a more serious sanction. To do so could potentially create an illogical "seesaw" effect—where more egregious misconduct that results in greater adverse natural consequences leads to a reduced sanction because we consider the adverse consequences as a mitigating factor.

3. Restitution

The hearing judge found that Mr. Bonner made timely good faith efforts to make restitution and to rectify the consequences of his actions. The hearing judge noted that Mr. Bonner made complete restitution to the Firm with respect to the misappropriated funds involved in both the 2012 and 2015–2019 misconduct. Although restitution was not made until after Mr. Bonner's conduct was exposed, the hearing judge concluded that it was nonetheless promptly made.

Bar Counsel excepts to this mitigating factor and relies upon *Attorney Grievance Commission v. Miller*, 467 Md. 176 (2020) and *Attorney Grievance Commission v. Frank*, 470 Md. 699 (2020). We overrule Bar Counsel's exception. We disagree with Bar Counsel that *Miller* and *Frank* provide support for a rejection of restitution as a mitigating factor in this case. In *Miller*, the attorney argued that she made timely good faith efforts to make restitution because she apologized to the client numerous times and eventually returned the client's money. 467 Md. at 225. We concluded that the refund did not constitute good faith efforts to make restitution because the refund "came long after [the attorney's] dispute with [the client] and after [the client] had filed her complaint with Bar Counsel." *Id.* In *Frank*, the hearing judge found that the respondent provided restitution "only as a result of" Bar Counsel's investigation. 470 Md. at 730. To be sure, Mr. Bonner did not make restitution until after his misconduct was discovered. However, Mr. Bonner promptly repaid the $3,070.11 in 2012 after he was confronted and repaid the Firm $35,000 for his subsequent misconduct. With respect to the 2012 repayment, he repaid the funds even though there was no implication that the Firm would report his conduct. The restitution for his subsequent misconduct occurred before Bar Counsel initiated its investigation.

35

Concerning the second payment, Mr. Bonner repaid the Firm significantly more than the amounts that he misappropriated—he paid the actual expenses and the cost of the Firm's investigation in the matter. We determine that the hearing judge did not err in concluding that Mr. Bonner established this mitigating factor.

4. Remorse

The hearing judge noted that, although "Mr. Bonner may not have been genuinely remorseful after the first incident of misconduct in 2012 or when he was engaging in his later incidents of misconduct, he has since accepted responsibility for his actions[.]" The hearing judge determined that Mr. Bonner met his burden and demonstrated by a preponderance of the evidence that he was remorseful for his actions. The hearing judge commented that Mr. Bonner "testified credibly about his regret in disappointing his colleagues and losing their trust, causing shame to his family and friends, and failing in his efforts to be a role model for his children." The hearing judge also credited the testimony of three of Mr. Bonner's former law partners, Chris Hassell, Michael Hicks, and Joseph Crociata, who testified about their perception of Mr. Bonner's remorse.

Bar Counsel excepted to the hearing judge's finding of remorse and argues that Mr. Bonner's expressions of remorse are insincere. Bar Counsel points out that during the hearing in this matter, Mr. Bonner admitted on cross-examination that, while he knew his conduct was improper, he did not feel any remorse between 2015, when he again began misappropriating funds from the Firm, and November 2019, when he was confronted by his partners. Bar Counsel also refers us to the testimony of Mr. Bonner's expert witness, Dr. Binks, who testified on cross-examination that Mr. Bonner did not feel significant

remorse about his misconduct in 2012 or between 2015 and 2019, and it was not until sometime after he was caught and left the Firm that he began to feel remorse.

Based upon our review of the record, we overrule Bar Counsel's exception. The hearing judge credited Mr. Bonner's testimony, as well as Mr. Hassell's and Mr. Hicks's testimony concerning Mr. Bonner's remorse. These are credibility determinations within the purview of the hearing judge. *See* Md. Rule 19-740(b)(2)(B) (this Court gives "due regard to the opportunity of the hearing judge to assess the credibility of witnesses[]"). We will not substitute our judgment for the judgment of the hearing judge with regard to credibility determinations.

5. Cooperation with and Disclosure to Bar Counsel

The hearing judge found that Mr. Bonner "provided full and free disclosure to Bar Counsel and demonstrated a cooperative attitude toward the attorney discipline proceedings." Bar Counsel acknowledged the existence of this mitigating factor.

6. Character or Reputation

In his Findings of Fact and Conclusions of Law, the hearing judge commented extensively on the testimony concerning Mr. Bonner's character and reputation in the community. The hearing judge stated that Mr. Bonner was "highly regarded within the profession." The hearing judge noted that Mr. Bonner was named the 2016 Lawyer of the Year by the DCDLA. The hearing judge credited the testimony of several witnesses who described Mr. Bonner's good character. Mr. Hicks, one of Mr. Bonner's former law partners, described Mr. Bonner's character as "impeccable," and someone who was always there for people at the Firm. John Youmans, a neighbor and good friend, described Mr.

Bonner as "one of the more upstanding people I've ever known" and "the epitome of somebody who would give [you the] shirt off [his] back." Mr. McGavick noted that, although "we are in a room because a flaw emerged, [] I have never [personally] observed a flaw in Keith's character. I hold him in the utmost respect and trust and always have." Another former partner, Joseph Crociata, described how, upon the death of his father, he went to Mr. Bonner's office and was touched by "the sympathy [Mr. Bonner] showed me and the way he received me on what was probably the most difficult day of my life." The hearing judge stated that "[t]he conclusion drawn from the testimony of these witnesses is that Mr. Bonner is a man who is always willing to help when others are having problems. [] Each witness was aware of Mr. Bonner's misconduct and testified that it did not affect their view of his character." The hearing judge found "by a preponderance of the evidence that Mr. Bonner's professional reputation and character generally, including the traits of kindness, generosity,[18] empathy and compassion, should be and are a mitigating factor." Upon our independent review of the record, we agree with the hearing judge's assessment of Mr. Bonner's professional reputation and character.

---

[18] Concerning Mr. Bonner's generosity, the hearing judge commented on the community service that Mr. Bonner has performed during the COVID-19 pandemic, including looking after elderly neighbors who needed assistance due to significant health issues. The hearing judge also pointed out that Mr. Bonner has spent a substantial amount of his free time since his departure from the Firm volunteering at Martha's Table, a nonprofit organization that provides food to those in need. The hearing judge noted that Mr. Bonner was recognized as one of the "top 20 volunteers of 2020," through his performance of nearly 200 hours of community service.

7. Unlikelihood of Repetition

The hearing judge found that, because Mr. Bonner is 67 years old, unlikely to ever practice law again, and has meaningfully participated in counselling, he is unlikely to repeat this misconduct. The hearing judge commented on Mr. Bonner's counseling with Denise Perme, the Associate Director of the District of Columbia Lawyer Assistance Program who has helped "Mr. Bonner learn how to deal with his anger and [] accept that he cannot change other people." The hearing judge credited Ms. Perme's testimony that Mr. Bonner has "'made enormous strides' in allowing people to be different and understanding that, if he is emotionally troubled by something, he needs to change his own situation." The hearing judge also referred to Dr. Binks's expert opinion that Mr. Bonner's behavior was "unique to a set of circumstances that are unlikely to be repeated both because of their uniqueness and because of who he is, a different man now than he once was." Bar Counsel did not file exceptions to the hearing judge's finding on this mitigating factor. Upon our independent review of the record, we agree with the hearing judge's assessment that Mr. Bonner is unlikely to repeat this behavior in the future.

8. Emotional Problems

This brings us to the final mitigating factor found by the hearing judge—the presence of emotional problems. The hearing judge found that, although Mr. Bonner's "emotional problems in no way justify [his] actions, they at least provide some insight into why he acted as he did, and the Court finds that his emotional problems are properly considered in mitigation." In support of this finding, the hearing judge commented on the testimony provided by Ms. Perme and Dr. Binks

39

related to [Mr. Bonner's] emotional issues and the causal connection between those issues and Mr. Bonner's conduct, *i.e.*, that his conduct arose from the dynamics of his experience at the Firm and emotional distress that resulted therefrom. Ms. Perme observed that Mr. Bonner "allowed his experience at the firm and with his partners to influence his perspective and his behavior to the point where he developed a pattern of misconduct." In Ms. Perme's opinion, "his misconduct was fueled by a level of resentment that he was not dealing with effectively at the time." Dr. Binks described Mr. Bonner's conduct as "situational—unique to a set for circumstances" related to both the dynamics at the Firm and to Mr. Bonner's underdeveloped emotional awareness. According to Dr. Binks, Mr. Bonner ultimately "consciously and unconsciously took matters into his own hands and inappropriately reimbursed himself of expenses unrelated to firm business."

(Cleaned up) (footnote omitted). The hearing judge also credited Mr. Bonner's testimony that he experienced frustration and anger that he could not control to the point that, at times, he had to leave the office, fearing that he might "stroke out." The hearing judge noted that Mr. Bonner testified to being so upset at times that "he couldn't even sleep and couldn't even eat." (Cleaned up). Based upon this evidence, the hearing judge found that "[a] preponderance of the evidence supports a finding that Mr. Bonner was experiencing significant emotional problems during the time of his misconduct, and that his misconduct was related thereto[.]" The hearing judge found this to be a mitigating factor.

Bar Counsel excepts to the hearing judge's finding of a mitigating factor, and relies upon *Attorney Grievance Commission v. Vanderlinde*, 364 Md. 376 (2001) and *Weiss*, 389 Md. 531, in which this Court rejected the attorneys' emotional and personal problems as constituting mitigating factors. Bar Counsel asserts that Mr. Bonner's case for personal or emotional problems is much weaker than the cases presented in *Vanderlinde* and *Weiss*, and contends that "[b]eing angry, feeling isolated, and feeling that others are not billing enough hours do not, in any instance, justify, mitigate, or

40

explain a years-long scheme of knowing and intentional misrepresentation accompanied by numerous misrepresentations." Bar Counsel points out that Dr. Binks testified that Mr. Bonner had become "self-righteous and entitled" and that he felt "justified" in engaging in intentional misconduct because Mr. Bonner felt that "he wasn't getting his due in financial compensation from the other partners based on the amount of work he was doing[.]" Bar Counsel contends that Dr. Binks's diagnosis of "Adjustment Disorder with Anxiety" is "related to the after-effects of his misconduct, including the loss of his career and the anxiety associated with disciplinary proceedings." In further support of Bar Counsel's position that any anxiety suffered by Mr. Bonner relates to the *consequences* arising from his misconduct being *discovered* rather than a *cause* of the misbehavior, Bar Counsel directs us to Dr. Binks's testimony that Mr. Bonner has "developed significant anxiety symptoms" and that a "positive outcome of his [disciplinary] case would go a long way to ameliorate his symptoms." Bar Counsel points out that there is no evidence that Mr. Bonner was suffering from any mental health disorder during the period of misconduct and argues that Mr. Bonner's feelings of self-righteousness and entitlement do not constitute mitigation. According to Bar Counsel, Mr. Bonner's "anxiety in facing the natural consequences of his illegal and dishonest conduct similarly does not constitute mitigation."

Mr. Bonner argues that he has established "more mitigation" than the respondents in *Vanderlinde* and *Weiss*, and that the mitigation he has established "meets the compelling circumstances standard" established in *Vanderlinde*, which we describe in more detail below. Mr. Bonner relies on *Attorney Grievance Commission v. Brigerman*, 441 Md. 23, 43 (2014)—a case in which this Court found the respondent's divorce and custody

41

proceeding created "personal problems" which constituted a mitigating factor where the underlying misconduct involved intentional dishonesty.

Like many cases involving intentional misconduct such as theft or misappropriation, we start our discussion with the *Vanderlinde* case. In that case, the attorney was found to have misappropriated $3,880.67 from her employer over a period of time. *Vanderlinde*, 364 Md. at 381. Like Mr. Bonner here, Ms. Vanderlinde admitted that she had violated Maryland Rules 8.4 (a), (b) and (c). *Id.* The evidence was undisputed that Ms. Vanderlinde had a history of depression, that her marriage was falling apart, her daughter was suffering from psychological problems, that she had lost her job and was unsuccessful as a real estate agent, and that she began taking the money because she needed to pay her bills. She argued that the "pressures of her life" and mental health issues, including periods of depression, mitigated against disbarment. *Id.* Similar to attorney disciplinary proceedings where this Court had considered alcohol and drug problems in respect to mitigation of sanctions, Ms. Vanderlinde likened her mental condition to an attorney with a drug or alcohol problem. As such, she argued that "where is there is a finding that the attorney's conduct is, in whole or in part, a result of a mental condition that affects her or his actions, the Court should recognize a new mitigation circumstance that warrants less than a serious sanction." *Id.* at 387.

After examining the history of cases involving attorneys who were attempting to use drug or alcohol abuse to mitigate their sanction in disciplinary proceedings, we held:

> [I]n cases of intentional dishonesty, misappropriation cases, fraud, stealing, serious criminal conduct and the like, we will not accept, as 'compelling extenuating circumstances,' anything less than the most serious and utterly

42

debilitating mental or physical health conditions, arising from any source that is the 'root cause' of the misconduct *and* that also result in an attorney's utter inability to conform his or her conduct in accordance with the law and with the M[A]RPC. Only if the circumstances are that compelling, will we even consider imposing less than the most severe sanction of disbarment in cases of stealing, dishonesty, fraudulent conduct, the intentional misappropriation of funds or other serious criminal conduct, whether occurring in the practice of law, or otherwise.

*Id.* at 413–14. We explained that, although we will generally accept a hearing judge's findings concerning the existence of certain mental conditions and their effect, it is for *this Court* to answer whether "such findings are 'compelling extenuating circumstances,' justifying a lesser sanction in cases of dishonesty, deceit, fraud, intentional misappropriation, stealing, and the like[.]" *Id.* at 414.

Applying these standards to Ms. Vanderlinde, we concluded that she had not demonstrated that her mental condition constituted compelling extenuating circumstances. The evidence demonstrated that, although she had "personal problems, some of which were severe, there [was] little evidence that she was not able to handle the every day economic affairs of the life to which she had, in a manner of speaking, descended." *Id.* at 415. We noted that "[h]er mental problems did not affect her ability to be a competent, and, for a period, successful thief. Her judgment when acting as a thief was appropriate—for a thief." *Id.* We stated that:

Upon reflection as a Court, in disciplinary matters, we will not in the future attempt to distinguish between degrees of intentional dishonesty based upon convictions, testimonials or other factors. Unlike matters relating to competency, diligence and the like, intentional dishonest conduct is closely entwined with the most important matters of basic character to such a degree as to make intentional dishonest conduct by a lawyer almost beyond excuse. Honesty and dishonesty are, or are not, present in an attorney's character.

43

*Id.* at 418. We further noted that "[d]isbarment ordinarily should be the sanction for intentional dishonest conduct." *Id.* We explained that, when considering cases in which an attorney's misconduct relates to honesty, especially in cases "where there is any type of theft or intentional misappropriation of funds or other serious criminal conduct,"

> there[] needs to be almost conclusive, and essentially uncontroverted evidence that would support a hearing judge's finding not only that the attorney had a serious and debilitating mental condition, but that the mental condition, in a sustained fashion, affected the ability of the attorney in normal day to day activities, such that the attorney was unable to accomplish the least of those activities in a normal fashion. Unless that standard is met[,] the impairment is not the 'root cause' of the misconduct.

*Id.* at 418–19. Applying these principles to Ms. Vanderlinde, we concluded that disbarment was the appropriate sanction for her misconduct. *Id.* at 419.

In the two decades since *Vanderlinde*, the standards announced in that case have been considered and discussed in numerous cases. *Attorney Grievance Comm'n v. Collins*, ___ Md. ____ (filed Feb. 25, 2022). In fact, it is not surprising that our decision in this case coincides with our decision in *Collins*, which discusses *Vanderlinde* and its progeny. However, as discussed in *Collins*, our application of the *Vanderlinde* standard has not been without exceptions.

In *Collins*, we conducted a survey of cases in which we have applied the *Vanderlinde* standard to impose a sanction of disbarment and described "an increasing number of cases involving intentional dishonesty in which we have not imposed the sanction of disbarment." *Collins*, slip op. at 35. We will not repeat that analysis here. However, we make some important observations and pronouncements in *Collins* that are worth repeating. First, as noted, given the "long line of cases in which we have not imposed

44

the sanction of disbarment," which we discuss in detail in *Collins*, "it is time to expressly recognize that our holding in *Vanderlinde* no longer exclusively sets the standard for imposition of the sanction in cases involving intentional dishonesty." *Id.* at 49. Based upon our survey of cases,

> [w]hat can be gleaned from the sanctions imposed in cases involving intentional dishonesty post-*Vanderlinde* in recent years, is that, increasingly, we have not imposed the sanction of disbarment where the dishonest conduct at issue does not involve theft, fraud, harm to a client or third party, or the intentional misappropriation of funds. We have on multiple occasions imposed a sanction less than disbarment in cases involving intentional dishonest conduct where there was no theft or intentional misappropriation of funds by the attorney, the attorney had not benefited or profited from the misconduct, and no client had been harmed. Going forward, it is clear that cases involving dishonesty and knowingly made false statements will be assessed on an individual basis to determine whether the misconduct at issue gives rise to deployment of the standard set forth in *Vanderlinde*, namely, whether compelling extenuating circumstances that are the "root cause" of the misconduct are required to warrant a sanction less than disbarment.

*Collins*, slip op. at 49–50.

Applying the principles articulated above to Mr. Bonner's conduct, we first start with the notion that, in cases involving intentional dishonesty, disbarment is ordinarily warranted. *See Attorney Grievance Comm'n v. Sperling*, 432 Md. 471, 497 (2013) (observing that "the sanction for dishonest conduct is generally disbarment"); *Attorney Grievance Comm'n v. Vlahos*, 369 Md. 183, 186 (2002) (holding that disbarment is the proper sanction when an attorney engages in the misappropriation of funds, regardless of the source of the money). However, we do not apply this generalization as a bright-line rule and will look at the individual facts and circumstances of the particular case. *See Attorney Grievance Comm'n v. Lane*, 367 Md. 633, 647 (2002) (explaining that "[w]e did

not apply *Vanderlinde* as a bright-line rule," and explaining our holding in that case as "'ordinarily' disbarment will be the appropriate sanction when dishonesty is involved, however, we must still examine the facts, circumstances and mitigation in each case[]"); *Attorney Grievance Comm'n v. Palmer*, 417 Md. 185, 211 (2010) (explaining that the *Vanderlinde* principle, "as clarified in *Lane*," is "consistent with the long-chanted mantra that the appropriate sanction in an attorney-discipline matter 'depends on the facts and circumstances of each case[]'") (citations omitted).

Here, we determine that Mr. Bonner's intentional dishonest conduct involving misappropriation does not align itself with the intentional dishonest conduct in cases in which we have imposed a sanction less than disbarment. As we observed in *Collins*, although these "non-disbarment" cases involve intentional dishonest conduct, they have a common nexus—specifically, there was no theft or intentional misappropriation of funds by the attorney, and the attorney did not benefit or profit from the misconduct. *See*, *e.g.*, *Attorney Grievance Comm'n v. Johnson*, 472 Md. 491, 547–48 (2021) (imposing a sentence of indefinite suspension, with the right to reapply after one year, where an attorney's nephew, a non-attorney employee, misappropriated client's funds from the attorney trust account, and after discovering the employee's theft, the attorney acted in a deceitful manner by "lying to his clients to prolong the time in which he had to remit their settlement funds[]"); *Attorney Grievance Comm'n v. Riely*, 471 Md. 458 (2020) (imposing a sanction of indefinite suspension, with the right to apply for reinstatement no sooner than one year, where the attorney made a false statement to a government agency at a meeting during the course of representing a client, misled a client about the efforts made on her

46

behalf in a case, and made false statements to Bar Counsel in a letter about the case); *Keating*, 471 Md. 614 (imposing a sanction of indefinite suspension, with the right to apply in six months, where the attorney submitted a will to the Register of Wills which she falsely represented that she had witnessed (when in fact she signed the will after her client's death, in an effort to carry out her client's wishes)); *Attorney Grievance Comm'n v. Singh*, 464 Md. 645 (2019) (imposing a sanction of sixty days' suspension where the attorney falsely testified at a deposition during Bar Counsel's investigation that his practice was to deposit a client's filing fees into a trust account instead of his operating account, where the fees remained until he paid the filing fee); *Attorney Grievance Comm'n v. Hecht*, 459 Md. 133 (2018) (imposing a sanction of indefinite suspension, with the right to petition for reinstatement after twelve months where the attorney undertook representation of a client during a period when he was suspended, made misrepresentations to his client about his suspension, and made misrepresentations to Bar Counsel during the investigation); *Attorney Grievance Comm'n v. Steinhorn*, 462 Md. 184 (2018) (imposing a sanction of indefinite suspension with the right to apply for reinstatement after six months where the attorney knowingly included false information in complaint forms filed in a trial court by lumping together an amount of an underlying debt and attorney's fees and representing the total as the underlying debt in an effort to conceal that he was collecting attorney's fees); *Attorney Grievance Comm'n v. Shapiro*, 441 Md. 367 (2015) (imposing a sanction of indefinite suspension where the attorney concealed from a client the status of a malpractice case for five years and made direct misrepresentations to the client leading her to believe that the case was active); *Brigerman*, 441 Md. 23 (imposing a sanction of indefinite

suspension where the attorney misrepresented to his client and Bar Counsel that he would promptly return the client's file to the client); *Sperling*, 432 Md. 471 (imposing a sanction of indefinite suspension where the attorney made material misrepresentations to the trial court in his representation of clients in an attempt to mislead the court into reopening his client's case).[19]

---

[19] We similarly reject Mr. Bonner's reliance on *Attorney Grievance Comm'n v. Burghardt*, 442 Md. 151 (2015) and *Attorney Grievance Comm'n v. Stillwell*, 434 Md. 248 (2013)—two reciprocal discipline cases involving intentional dishonest conduct where we imposed a sanction less than disbarment. We determine that these cases are inapposite for purposes of determining a sanction in this case. In *Burghardt*, the attorney submitted requests for reimbursement of expenses to her law firm, which were for personal expenses. *Id.* at 156. She intentionally misrepresented that they were business expenses instead of personal and falsified invoices. After the firm questioned her, she acknowledged her misconduct, and she was terminated. *Id.* Although we imposed reciprocal discipline consisting of suspension, her misconduct spanned only a few months. Here, Mr. Bonner engaged in misappropriation activities, was caught, expressed remorse, and then resumed his misconduct for a period spanning several years. In *Stillwell*, the attorney failed to return a partial fee payment after the client terminated the attorney's services. 434 Md. at 257. We imposed a sanction of indefinite suspension with the right to apply for readmission after 60 days. *Id.* at 274. In imposing the sanction of indefinite suspension, we noted that this case involved charges related to safekeeping of the client's property but did not involve "misappropriation or other dishonest conduct." *Id.* at 273. Here, Mr. Bonner's conduct involved misappropriation and dishonest conduct.

Mr. Bonner also cites to *Attorney Grievance Commission v. McCulloch*, 397 Md. 674 (2007) as support for a sanction less than disbarment. In *McCulloch*, the attorney deposited unearned funds into her operating account, spent the funds before they were earned, and failed to timely refund unearned fees to the client after the client terminated the representation. *Id.* at 681. We imposed a sanction of indefinite suspension. Although we upheld the violation of Rule 8.4(c), we observed that the hearing judge found that the attorney's conduct in spending an unearned portion of the retainer lacked the requisite criminal intent to constitute theft and noted that the hearing judge's findings on that issue were "at best ambiguous, indicating that, at the least, the hearing [judge] had some doubt as to the level of the respondent's culpability." *Id.* at 689. As such, we determined that "[d]isbarment should not rest on such a finding." *Id.* Here, the misconduct was not related to one isolated incident, and the record clearly supports a finding of intentional misappropriation of funds.

We conclude that Mr. Bonner's intentional dishonest conduct involving misappropriation of funds *is* of the variety in which we have imposed a sanction of disbarment. *See*, *e.g.*, *Vanderlinde*, 364 Md. 376 (underlying misconduct involved theft of funds from an employer); *Levin*, 438 Md. 211 (disbarring attorney who misrepresented his case load and anticipated fees to his employer by creating fictitious clients and paperwork in order to obtain additional salary); *Vanderslice*, 435 Md. 295 (rejecting the imposition of reciprocal discipline of a one-year suspension in favor of disbarment where the attorney intentionally committed theft eight times over a period of ten months); *Attorney Grievance Comm'n v. Carithers*, 421 Md. 28 (2011) (disbarring attorney for conduct including misappropriation of attorney's fees owed to his law firm); *Weiss*, 389 Md. 531 (declining to impose reciprocal discipline of suspension, in favor of disbarment, where attorney misappropriated funds from his law firm in the District of Columbia); *Vlahos*, 369 Md. 183 (disbarment was the appropriate sanction where attorney misappropriated funds belonging to his law firm over a period of approximately one and one-half years); *Spery*, 371 Md. 560 (disbarment was the appropriate sanction where an attorney misappropriated $47,821.16. from his real estate partnership over a period of five years and made misrepresentations to his partners to conceal the theft).

As such, Mr. Bonner's intentional misconduct involving the misappropriation of funds "gives rise to deployment of the standard set forth in *Vanderlinde*, namely whether compelling extenuating circumstances that are the 'root cause' of the misconduct are required to warrant a sanction less than disbarment." *Collins*, slip op. at 50. We further determine that Mr. Bonner's emotional problems described by Dr. Binks, Ms. Perme, and

Mr. Bonner do not satisfy that standard. Mr. Bonner readily acknowledges he acted out in anger and frustration over his perception of unfairness in the compensation structure at the Firm. In his testimony, Mr. Bonner repeatedly used the words "angry" and "frustrated" to describe his feelings toward some of his partners during the years in which he engaged in the misappropriation of funds from the Firm. Concerning his perception that other equity partners were not billing as many hours as him, he testified that he was "really angry." He acknowledges that his anger manifested itself through his misappropriation of funds. To be sure, after his misappropriation was discovered and his relationship with the Firm was terminated, through counseling, Mr. Bonner appears to have developed some self-awareness that his misconduct that was driven by his anger was wrong:

> I was like [sic] had just started treating myself to make myself feel better and unfortunately it was the way I coped with it to compensate myself for not being what [sic] I thought was being properly compensated. And so that's how I dealt with things instead of [sic] if I wasn't going to get paid any more then I would treat myself to certain things. And it's crazy, I know it. I know it sounds crazy but that's the way I felt.

> I mean I was so angry and resentful I can't even tell you.

Dr. Binks's testimony is consistent with Mr. Bonner's description of his feelings and emotions during this period in which he was engaging in misdeeds. Dr. Binks testified that Mr. Bonner had become "self-righteous and entitled" and that he felt "justified in engaging in intentional misconduct" because Mr. Bonner felt that "he wasn't getting his due in financial compensation from the other partners based on the amount of work he was doing[.]"

We reject Mr. Bonner's emotional problems arising from his anger and frustration over what he perceived to be his inequitable treatment within the Firm's compensation structure as constituting a mitigating factor that demonstrates compelling extenuating circumstances thereby warranting a sanction less than disbarment. At bottom, Mr. Bonner's anger and frustration resulted in him taking actions for dishonest and selfish purposes. Mr. Bonner's contention that we should consider these emotional problems as a mitigating factor here employs some circular logic. We consider "dishonest or selfish motive" as an aggravating factor, which was proven here. We will not cancel out the presence of this aggravating factor in mitigation simply because the dishonest and selfish motives were fueled by feelings of anger, frustration, and self-righteousness.

Although we have considered the mitigating factors that Mr. Bonner has proven, such as his remorse for acting out, his acceptance of responsibility through the repayment of the misappropriated funds, his full cooperation with Bar Counsel, and his admission in full of his various misdeeds, as well as the efforts that he has made in counseling to understand and acknowledge the reasons that he engaged in this misconduct, in addition to his character and reputation, we conclude that, under the facts and circumstances of this case, these mitigating factors do not tip the scales in favor of a sanction less than disbarment. *See*, *e.g.*, *Levin*, 438 Md. at 231–32 (disbarment was the appropriate sanction where the attorney misrepresented his case load and clients in an effort to obtain additional salary despite the respondent's recognition of the wrongfulness of his action, his full payment of the financial debt to the law firm within two months, and his self-reported misrepresentations to Bar Counsel); *Vanderlinde*, 364 Md. at 419 (disbarment was the

51

appropriate sanction notwithstanding the fact that the respondent returned the funds before being caught, freely acknowledged the misappropriation, and despite the presence of impaired mental faculties, including depression).

In addition to the presence of a dishonest and selfish motive, Mr. Bonner engaged in a pattern of misconduct that spanned several years. Mr. Bonner knew that his conduct was wrong. When his misdeeds were discovered in 2012, he had an opportunity to right the ship. Instead, in 2015, he veered the ship back onto the wrong course and continued to steer it awry until he hit ground in 2019. His pattern of misconduct involved not simply misappropriating funds but sometimes engaging in elaborate lies to his partners to cover his tracks, such as sending emails describing client meetings that never happened and creating false calendar entries and time sheets.

Considering the nature of Mr. Bonner's misconduct and the various mitigating and aggravating factors present here, we conclude that disbarment is the appropriate sanction.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST KEITH M. BONNER.**